EDWARD L. FELGNER'S ADMINISTRATORS *vs.*
ANN M. SLINGLUFF—ANN M. SLINGLUFF
*vs.* EDWARD L. FELGNER'S ADMRS.

*Merger—Conveyance of Equity of Redemption to Mortgagee—*
*Mortgage Sale Is Res Adjudicata—Agreement that Mort-*
*gagor Shall Have Surplus of Proceeds of Sale of Property—*
*Bill for Accounting—Evidence—Interest.*

The conveyance of the equity of redemption to a mortgagee does not necessarily operate to merge and extinguish the mortgage. Whether it has that effect or not depends upon the intention of the mortgagee.

A conveyance of the equity of redemption to a mortgagee, after his assignment of the mortgage for the purpose of foreclosure, does not create a merger.

A sale under the power contained in a mortgage passes the title which the mortgagor had at the time the mortgage was recorded and not merely the title he had at the time of the sale.

The principle of *res adjudicata* applies to a mortgage foreclosure sale, and its validity cannot be attacked collaterally.

If the mortgagee was not authorized for some extrinsic reason
to make the sale, it should be set aside by a bill of review or
other proceeding.

The evidence in this case is held to establish the following facts:
That the plaintiff and her husband executed a mortgage upon
a tract of land to the defendant to secure the payment of a
certain sum of money, and also assigned the proceeds of a
life insurance policy in part payment, under an agreement
that the property should be sold at private sale or otherwise,
that meanwhile the mortgagee should be entitled to the rents,
and that any surplus over and above the amount of the mort-
gage debt arising from the proceeds of sale, the rents and the
policy of insurance, should be paid over to the plaintiff. Aft-
erwards, in order to avoid a foreclosure, plaintiff executed a
deed to the defendant conveying the equity of redemption,
which deed defendant did not place on record, but of this
fact plaintiff was ignorant. The property was, however, sold,
under a power in the mortgage and conveyed to the defend-
ant, the mortgagee, his object in making the sale being to
acquire an unquestionable title, but the plaintiff had no actual
knowledge of this mortgage sale. After that, plaintiff occu-
pied the property for a time and endeavored to sell the same.
*Held,* that the title acquired by the defendant under the fore-
closure sale was not intended to, and did not, destroy the
rights of the plaintiff under the agreement relating to the sur-
plus of the proceeds of sale.

*Held,* further, that the ratification of the mortgage sale does
not preclude the plaintiff from asserting under these circum-
stances her rights to the surplus arising from a private sale
of the property afterwards made by the defendant over and
above the amount of the mortgage.

The defendant, after the above-mentioned mortgage sale, sold
the property at private sale to different parties for a sum in
excess of the mortgage debt, and plaintiff's bill in this case
asked for a decree for the excess of the receipts of the de-
fendant from the property in pursuance of said agreement.
*Held,* that the plaintiff is not to be charged with the costs of
the foreclosure proceedings, since the same were not necessary
to vest the fee simple title in the defendant, and because those
proceedings were had without notice to the plaintiff.

*Held,* further, that certain rents received from the property had not been paid to the defendant on account of the mortgage debt and should not be deducted from the amount of the same.

*Held,* further, that since the defendant only demanded four per cent. interest on the deferred payments of the purchase money of the property sold by him, the plaintiff should not be charged with six per cent.

*Held,* further, that the plaintiff is not to be charged with interest on the notes given for interest on the mortgage debt after their maturity, the intention of the parties being to the contrary.

*Held,* further, that the defendant is entitled to a certain allowance for taxes, insurance, advertisement and other expenses, as set forth in the opinion in this case and should be charged with interest on the life insurance policy which he failed to collect for some months, although it was collectible.

*Held,* further, that interest on the balance found to be due to the plaintiff should be allowed from the time defendant made a statement of the account after the private sale of the property by him.

*Decided January 12th, 1909.*

Cross-appeals from the Circuit Court of Baltimore City (ELLIOTT, J.)

The cause was argued before BOYD, C. J., BRISCOE, PEARCE, SCHMUCKER, BURKE, THOMAS, WORTHINGTON and HENRY, JJ.

*Vernon Cook* (with whom was *Harry B. Dillehunt* on the brief), for Felgner's Administrators.

*William L. Marbury* and *J. Kemp Bartlett* (with whom was *Jesse Slingluff* on the brief), for Ann M. Slingluff.

BOYD, C. J., delivered the opinion of the Court.

Mrs. Ann M. Slingluff filed a bill in equity against Edward L. Felgner for an accounting for all sums of money re-

ceived by him from a property previously owned by her, and prayed for a discovery and a decree *in personam* against him for such amount as may be found to be due her. The lower Court decreed that he pay her the sum of $3,802.03 and costs, and Mr. Felgner having died, his administrators were made parties defendant and entered an appeal from that decree. A cross-appeal was entered by Mrs. Slingluff.

On the 26th of September, 1899, Horace Slingluff, husband of the plaintiff, gave a mortgage, in which she joined, to Mr. Felgner for $22,000.00 on a property in Baltimore County county called "Upton." Mr. Slingluff afterwards took the benefit of the Bankrupt Law, and on March 27, 1900, the mortgage was foreclosed and the property purchased by Mr. Felgner. At that time large improvements which Mr. Slingluff had begun were incomplete and the dwelling house was consequently in bad condition. Mr. Felgner agreed with Mrs. Slingluff that he would complete the repairs which were in course of construction, keep an account of the moneys expended thereon and, when completed, would convey the property to her, who with her husband was to give Mr. Felgner a note secured by mortgage upon said property. The parties do not materially differ as to the terms of that agreement— the principal difference being that the plaintiff claims it was made before the foreclosure sale of March 27, 1900, and the defendant that it was made shortly afterwards.

On May 1, 1901, a deed was executed for the property to Mrs. Slingluff, and Mr. and Mrs. Slingluff gave Mr. Felgner a mortgage of that date to secure a note for $30,495, payable three years after date and six interest notes for $913.85, each, one being payable every six months after date. The principal sum included the original mortgage of $22,000, the repairs made by Mr. Felgner amounting to $4,896.74, the costs of the foreclosure proceedings $687,40, including a fee of $500.00 to Mr. Dillehunt, who was the attorney who made the sale, and $2,367.90 interest to May 1, 1901, which together with an adjustment of taxes, $17.97—amounted to $30,495.01. We do not understand the correctness of those

sums to be questioned, but the plaintiff claims that there should have been a credit of $1,400.00 for rent received from David Hutzler, which will be referred to later.

As additional security, Mr. and Mrs. Slingluff agreed to assign to Mr. Felgner an endowment policy of insurance issued on the life of Horace Slingluff for the sum of $5,000, which at the time, by reason of certain accumulations, had a cash value of something over $7,000. The Slingluffs also agreed to furnish the dwelling house, to provide a gardener and do what they could towards securing a good rental. The object of this was to get the property in a condition that would enable them to dispose of it to the best advantage, in order to pay off the mortgage and have some surplus for the benefit of Mrs. Slingluff, which she claims it was agreed she should have. The insurance policy was assigned to Mr. Felgner, but the trustees in bankruptcy of Mr. Slingluff made a demand for it, and after some litigation the matter was finally compromised by dividing the value of the policy, which resulted in Mr. Felgner receiving $3,574.15. Mr. Slingluff, who represented his wife, and Mr. Dillehunt, who represented Mr. Felgner, who was his father-in-law, practically agree as to what that agreement was, excepting Mr. Slingluff claims that the rents for 1900 were to go to Mr. Felgner while Mr. Dillehunt contends that the payment of rents to him was to begin with those of 1901. The rents were derived from the property during the summer season. Mr. Slingluff rented the property to David Hutzler for the summer of 1900 at $1,400.00, to Louis Hamburger for the summer of 1901 at $1,400. and to Levi Greif for the summer of 1902 at $1,200.00, and Mr. and Mrs. Slingluff expended money and time with a view to making the property attractive to purchasers.

There were a number of interviews between Mr. Slingluff and Mr. Dillehunt, and considerable correspondence passed between them, some of which will be hereafter referred to— the letter of October 11, 1902, bearing more particularly on the agreement that Mrs. Slingluff was to have the surplus,

over and above the claims and expenses of Mr. Felgner, out of a sale of the property. On February 24, 1903, a deed was executed by the Slingluffs to Mr. Felgner for the property embraced in the mortgage which was duly delivered to Mr. Dillehunt, but he put it in his safe and never recorded it. On April 17, 1903, Mr. Dillehunt, as assignee of the mortgage, reported a sale of the property under the power of sale to the Circuit Court for Baltimore County, in which report he states that he sold the property on April 8, 1903, to Mr. Felgner for $24,000. That sale was in due course ratified by the Court, an Auditor's report was filed and ratified and the deed was made by Mr. Dillehunt, assignee, to Mr. Felgner on May 13, 1903. Both Mr. and Mrs. Slingluff deny any knowledge of that foreclosure sale until the matters connected with this suit were placed in the hands of Mr. Bartlett, who, they allege, first told them of it, and they claim that they supposed the deed which they executed had passed the title to Mr. Felgner, subject to the agreement which they say then existed.

Before this bill was filed Mr. Felgner had sold part of the property to Charles D. Fitzgerald for $27,500.00 (as we understand the amount), and the balance to the Western Maryland Railroad Company for $5,812.50, and the plaintiff claims that the purchase money received, the insurance money and rents more than paid Mr. Felgner, who she alleges was compelled to give her the surplus under the agreement. The defendant denies there was any surplus, but contends that if there was the foreclosure proceedings preclude any recovery. The first question therefore to be determined by us is the effect of those proceedings.

1. We cannot agree with the counsel for Mrs. Slingluff that there was a merger by virtue of the deed of February 24, 1903. A sufficient answer to that contention is that before the deed was made, to wit, on October 31, 1902, the mortgage had been assigned to Mr. Dillehunt. While he undoubtedly took the assignment subject to all equities existing between the mortgagor and mortgagee, the legal title was transferred to him and hence there was no merger by reason

of the deed to Mr. Felgner. The general rule is that: "In order for the mortgage to be extinguished by the union of titles of the mortgagor and the mortgagee, such titles must unite in the same person at one and the same time." 20 *Am. & Eng. Ency. of Law* 1068. Even when a mortgagee acquires the equity of redemption in his own name it does not necessarily follow that the mortgage becomes merged and extinquished, but it depends upon the intention of the mortgagee, and when it is for his benefit to do so the presumption is that he intended to keep the mortgage alive. *Ibid,* 1064; *Polk* v. *Reynolds,* 31 Md. 106.

2. But notwithstanding there was no merger, and assuming for the present that there was an agreement that the surplus derived from the sale of the property was to go to Mrs. Slingluff, which we will consider later, was the effect of the foreclosure proceedings such as the defendant contends for? It cannot be doubted that the doctrine of *res adjudicata* applies to a mortgage foreclosure proceeding, such as this, as it does to other judicial proceedings, and of course the proceedings taken in reference to the foreclosure of the mortgage cannot be attacked collaterally. Again we must differ from the position taken by the counsel for the plaintiff that inasmuch as Mrs. Slingluff had no title at the time of the foreclosure, the sale passed no title. The statute expressly provides that: "All such sales, when confirmed by the Court and the purchase money is paid, shall pass all the title which the mortgagor had in the said mortgaged premises *at the time of the recording of the mortgage.*" Sec. 11 of Art. 66 of Code. If that were not so, and it only passed the title which the mortgagor had at the time of *the foreclosure,* the mortgagor could deprive the mortgagee of the security by selling the property. The case of *Queen City B'g. A'n.* v. *Price,* 53 Md. 397, cited by the plaintiff, involved an altogether different question. There it was held that the supposed power of sale was invalid, and hence the sale and the subsequent proceedings were void. It was there said that: "The mortgage stood as if no power of sale had been inserted in it," but in this case there is no

question about the validity of the power of sale, and if it could no longer be exercised by reason of the deed, the objection should have been made in the foreclosure case, or if the plaintiff was kept in ignorance of it, by reason of the conduct of the mortgagee, a bill of review or some appropriate proceeding in that Court was the proper remedy, if it be necessary to have that sale set aside.

3. But is that necessary under the circumstances of this case? The plaintiff is not contending that title to the property did not pass to Mr. Felgner—on the contrary, she contends that it had already passed by the deed. Mr. Dillehunt thus explains in his testimony why the foreclosure proceedings were taken: "After having gotten that deed I was afraid to record it because of the relationship between the mortgagor and mortgagee—I was afraid that somebody would say that they made it under duress, or something of that sort—I was a little fearful of it, and I did not record the deed, and then followed those foreclosure proceedings." He also said he thought at first of having the deed made to him, "so in case there was any trouble, the mortgage then could be foreclosed," but he changed his mind and thought it looked better to have it made to Mr. Felgner. The object of the foreclosure proceedings is thus clearly shown to have been simply to acquire the title in a way that Mr. Dillehunt thought was free from question, but he does not say that he ever notified either Mr. or Mrs. Slingluff of those proceedings, or of his intention to so proceed, and both of them swore that they were not aware of them. He never told them that he had not placed the deed on record, and Mr. Slingluff testified that when he heard of the sales made by Mr. Felgner he supposed they were made under the deed. It is difficult to believe that Mr. and Mrs. Slingluff would have executed the deed on February 24, 1903, if they had supposed, or if Mr. Dillehunt had then told them, that he would advertise the property for sale under the mortgage in less than a month, which he did. In Mr. Slingluff's letter of March 1st, 1902, he appealed to Mr. Dillehunt not to advertise the property as he was then thinking of doing.

He said that they would "be mortified and humbled in the eyes of the community, and all our efforts set at naught and my business injured by having the place advertised for sale at foreclosure proceedings." He offered to make a deed which Mr. Dillehunt was to hold until April 1st, and if they in the meantime paid the interest due he was to return the deed, and if the interest was not paid by that time, Mr. Dillehunt was to put the deed on record and they were to give quiet and peaceful possession of the property. No deed was then given, but on April 4, 1902, $911.51 was paid, for interest. On October 11, 1902, Mr. Dillehunt wrote a letter to Mr. Slingluff in which he said: "Enclosed please find deed to be executed by yourself and wife *under the agreement.* In consideration of Mr. Felgner's forbearance to foreclose the mortgage on Upton you were to give him an absolute deed for the property, he agreeing on his part to allow you to sell the property before March 1st next and pay him his claim and expenses, *you to take any balance left.* After March 1st next, he will be privileged to sell the property at his own price without any recourse to him by you or your wife or anyone else." That deed was not executed for some reason and was lost, but another one was sent later which was the one executed February 24, 1903. Mr. Dillehunt was asked whether that deed was drawn in accordance with the letter of October 11th, and replied that it was not—"it was a new agreement with the same contents in it," "really a renewal of the old agreement; that is what it was;" and he admitted on cross-examination that the Slingluffs did not agree on February 24, 1903, that all their rights were to expire on March 1st.

It therefore appears from Mr. Dillehunt's own testimony, and the letters, that the object in making the deed was to avoid a foreclosure, and that the foreclosure proceedings were taken in order that the title might be perfected, which Mr. Dillehunt thought doubtful under the deed alone, and not for the purpose of getting rid of whatever rights Mrs. Slingluff had acquired under the agreement. Indeed, no other conclusion could be reached without implying that Mr. Dille-

hunt was guilty of fraud, for he does not pretend that he in-
formed Mr. and Mrs. Slingluff that he would not make use
of the deed, or that he had not recorded it.    The sale was
made under proceedings which had been begun on October
31, 1902—nearly four months before the deed of February
24, 1903—and must have been advertised in about three
weeks after the deed was made, as the report shows it was
advertised for more than twenty days before the day of sale,
which was April 8, 1903.    It cannot be pretended that there
is anything in the record to suggest, much less prove, any
agreement or arrangement between February 24, and the ad-
vertisement or sale of the property, by which such rights as
Mrs. Slingluff had in the surplus, by virtue of the agreement,
were surrendered, or were intended to be surrendered, and it
is difficult to imagine a more effectual way of misleading the
Slingluffs than was adopted, if such effect must be given the
foreclosure proceedings as is now claimed for them.    In jus-
tice to Mr. Dillehunt we must say that his testimony shows
that no such effect was intended, but the sale was made, ac-
cording to him, to perfect what he deemed would be a defect-
ive title under the deed.    That being so, we must hold that the
title acquired by Mr. Felgner under the foreclosure sale was
not intended to, and did not, destroy the equity, if any, which
Mrs. Slingluff acquired *under the agreement* and which re-
sulted in the execution of the deed.    If the Slingluffs were
not aware of the sale, they could not be expected or required
under the circumstances to object to it, and if they did know
of it, they could not be supposed to believe or know that it
was intended thereby to give any greater effect to it than Mr.
Dillehunt admits, namely, to perfect what he thought was a
defective title—they certainly did not have any reason to be-
lieve that such equity as they acquired when or before the
deed was given was intended thereby to be destroyed.    We
cannot, therefore, hesitate to hold that under the peculiar cir-
cumstances of this case the plaintiff is not precluded by the
ratification of the sale from obtaining the relief sought in
this case.

4. The ratification of the audit at first seemed to present more difficulty, in so far as some of the items involved are concerned. But on further consideration we have no doubt about them. If Mrs. Slingluff had either actual or constructive notice of the foreclosure proceedings, as may be conceded, it is clear that if she is right in her contention as to the agreement, it could not have been the intention of the parties that after she and her husband had executed and delivered the deed, with the understanding that she should have the surplus, if any, if the property could be sold for more than the claim of Mr. Felgner, she was to be further subjected to large expenses in perfecting the title—especially without any notice to her of the necessity or desirability of proceedings to accomplish that end. She not only did not contest the proceedings, but if she had actually known of them she might very well have concluded that they did not affect her. She was not claiming the equity of redemption which the law gave her as mortgagor—on the contrary, she had surrendered it, as she and her husband believed then, and do not deny now. The sale under the power was to pass the interest she had *when the mortgage was recorded*—and not such as she acquired afterwards from the mortgagee. If she had filed exceptions to the sale, and the Court was of the opinion that Mr. Dillehunt's fears were well founded, it might have very properly overruled the exceptions on the ground that Mrs. Slingluff could not be financially injured by the proceeding, if her contention as to the agreement was right. And after the sale was ratified, the assignee of the mortgage might very well have claimed the right to have an audit made, so as to have the accounts between him and the real owner of the mortgage stated. There was no attempt to secure a decree *in personam* against Mrs. Slingluff for the balance as shown by that audit, and there could not have been without service on her, and then a Court of equity would not have passed a personal decree against her, if she had established the claim she now makes. It would be a fraud on her which a Court of equity would not assist in, if satisfied that her agreement was such

as she now claims.  After discussing the subject, it is said in *Story's Equity Pleading*, sec. 783 a: "But a former adjudication, even in a Court of equity, will not be a bar to a subsequent bill. unless the case made by the latter, *ana the equity,* are substantially the same.  It is said the grounds of the latter suit must be substantially identical with those of the former."  That being so, as it undoubtedly is, and the equity claimed in this case being substantially different, and by no means identical, from that determined by the *ex parte* proceedings in the Circuit Court for Baltimore County, we are of opinion that they do not preclude the plaintiff from asserting her claim under this bill.

As it was not raised at the argument, we have not deemed it necessary to discuss the question whether the defense of *res adjudicata* was properly presented in this case; inasmuch as it was not made in the pleadings; or the further question whether sec. 36 of Art. 5 of the Code would require us to consider that defense, although not raised below.  We would only add that it is not altogether free from doubt, as the evidence which might be used for that defense was perhaps admissible for other purposes, and hence we say it is at least doubtful whether section 36 of Art. 5 would apply.  That such defenses should be raised in equity by the pleadings is the general rule.  9 *Ency. of Pl. and Pr.* 616 and notes; *Phelps on Jurid, Eq.,* sect. 63; *Barroll's Chy. Pr.* 129; *Wagoner* v. *Wagoner*, 76 Md. 310.  But we will base our decision on the grounds stated above.

5. We come now to the question whether there was such an agreement as the plaintiff claims.  It cannot be doubted that there was at one time.  After Mr. Slingluff failed, he and his wife on the one hand and Mr. Dillehunt, representing Mr. Felgner, on the other hand, were endeavoring to arrange so that Mr. Felgner would not lose as mortgagee, and Mrs. Slingluff would eventually get something out of the property.  In their effort to accomplish that, she, together with her husband, became responsible for a mortgage of $30,495.00, and

assigned the policy of insurance which was then supposed to be worth over $7,000. Mr. and Mrs. Slingluff apparently worked earnestly to pay Mr. Felgner the interest, and to save something for themselves. Mr. Dillehunt was evidently anxious, and feared that his father-in-law might not recover the money which he had loaned for him, and was also kindly disposed towards the Slingluffs. The mortgage was dated May 1st, 1901, and the first interest was due November 1st, 1901, and by that time Mr. Dillehunt had received $1,400 from Mr. Hamburger for rent of the property, which he claims was to be applied to the principal. The letter of Mr. Slingluff of March 1st, 1902, admitted that there was interest due, which would seem to corroborate Mr. Dillehunt. In that letter Mr. Slingluff made a proposition to make a deed for the property which Mr. Dillehunt was to hold until April 1st, and if the interest was in the meantime paid the deed was to be returned, and, if it was not paid, they were to surrender possession. No deed was then made, but the interest was paid on April 4th, 1902, to November 1st, 1901. On June 30th, Mr. Dillehunt wrote to Mr. Slingluff that he would advertise the property in the next issue of the Maryland Journal, but it was not done, and on July 14th he wrote again saying that Mr. Felgner would wait until September 1st for the interest, which was that due on May 1st. Then on October 11th he wrote the letter enclosing the deed for execution, which we have quoted above. That deed was not executed, and the property was advertised for sale in November, but was withdrawn. Some time during the fall of 1902 Mr. Slingluff commenced negotiating with Dr. Geer, who was desirous of purchasing the property for use as a sanitarium. Those negotiations continued during that fall and winter, and Dr. Geer agreed to pay $30,000 for the house and 64 acres of ground. The Slingluffs, who still occupied the property, moved out about June 15th, 1903, and Dr. Geer took partial possession, but residents of the neighborhood objected to a sanitarium being there and Dr. Geer was unable to con-

summate the sale.  Mr. Dillehunt testified that Dr. Geer and
Mr. Felgner executed an agreement for the sale of that part
of the property, and negotiations were then pending with the
Western Maryland Railroad Company for the part it subse-
quently purchased.

Mr. Dillehunt also testified that Mr. Slingluff had nothing
to do with the property after the Geer sale fell through, but
Mr. Slingluff denies that, and said that he was negotiating
with Mr. Allan McLane at the time Mr. Dillehunt sold the
house and 64 acres to Mr. Fitzgerald, which was in Novem-
ber, 1903.  Of course, Mr. Slingluff had nothing to do with
the property after that.  But in addition to the testimony of
the Slingluffs, and some strong corroborating facts, such as
their occupation of the property after the deed was made (and
after the foreclosure proceedings also), until the middle of
June when they surrenderd it to Dr. Geer as the expected
purchaser, and the admission by Mr. Dillehunt that he did
make the agreement to take effect if the Geer sale was con-
summated, the books of Mr. Felgner show that he kept the
account in the name of H. Slingluff down to July 5th, 1905.
The defendant filed as an exhibit a copy of the account, and
as late as July 2, 1906, Mr. Dillehunt furnished a statement
of their accounts to Mr. Bartlett, attorney for Mrs. Slingluff.
On July 5, 1905, Mr. Felgner received the purchase money
for the portion of the property sold to the Western Maryland
Railroad Company, and Mr. Slingluff then asked for a state-
ment.    Mr. Felgner replied on November 17, 1905: "Your
favor of the 15 inst. addressed to Mr. H. B. Dillehunt was
handed to me.  In compliance with same, you will please find
enclosed a statement of your account, which I hope you will
find correct.  The calculations were made to July 5th, the
date of the settlement of the W. M. R. R. for the rest of the
property."  That statement is headed: "Mr. H. Slingluff in
acct. with E. L. Felgner," and begins with amount of mort-
gage of May 1st, 1901 (which is stated to be $29,095), and
concluded with an interest charge as of July 5th, 1905, cred-

its him with various amounts, including cash, life insurance, rent, interest from C. D. Fitzgerald, cash from Fitzgerald on March 10th, 1905, of $27,120.00, and cash sale to W. M. R. R. of July 5th, $5,812.50. It is impossible to understand why he would thus have written to Mr. Slingluff and have kept the account with him, if the agreement was not such as the plaintiff contends. It was doubtless kept in the name of H. Slingluff by reason of the fact that the original mortgage stood in that name, and not in that of Mrs. Slingluff. There certainly could be no reason for charging the Slingluffs with interest up to the day the last purchase money was received, if the understanding was not such as that claimed by the plaintiff. According to his charges and credits, there was still a balance, which he carried forward as follows: "1905, July 5—Balance due me, $1,409.46"—showing that he claimed that they then only owed him that amount, and not the balance found in the audit, as now relied on in this case. We are satisfied that there was an agreement such as was contended for by the plaintiff, and the expectation of getting something out of the property doubtless induced the Slingluffs to assign the policy of life insurance, to spend money and time in making it more salable, to subject themselves to many annoyances and finally to make a deed for it. We will now consider the items in controversy.

6. The first one we will consider is the Hutzler rent. The theory of the bill is that when the mortgage of May 1st, 1901, was given the plaintiff had paid the rent received from Mr. Hutzler in 1900, which amounted to $1,400.00, and hence the mortgage should have been $29,095, instead of $30,495. Mr. Slingluff testified that he received the $1,400.00 in four equal monthly payments of $350.00, and that he endorsed three of the checks so received over to Mr. Dillehunt, and afterwards gave him his individual check for the other $350.00. Mr. Dillehunt positively denies having received them, or either of them. But Mr. Slingluff also testified that he did not question the correctness of the amount of the mortgage,

but that the Hutzler rent should have been applied to interest *on that mortgage.* In answer to the question, "On what mortgage?" he replied: "The $30,000 mortgage," and he further testified as follows: "On May 1st, 1901, when the second mortgage was given, do you now say you owed $30,495 approximately or not? A. Yes, sir. Q. You do? A. Yes, sir. Q. Do you now claim that $1,400 from the Hutzler rent should have been deducted from that $30,000? A. No, sir. Q. You do not? A. No, sir; it was interest on the money in the interim. Q. What interim? A. May, 1901." It is clear, therefore, that his testimony does not support the allegations of the bill. His letter of March 1st, 1902, admits that interest was then overdue, which would not have been the case if the Hutzler rent was to be applied to the interest on that mortgage. The statement furnished Mr. Slingluff by Mr. Felgner does begin with: "1901, May 1—Amt. of mortgage, $29,095.00," but the mortgage itself shows that the amount was $30,495, and inasmuch as the item just below is: "Dec. 31—Interest, $1,171.77," it is probable that he was simply using that sum to show on what amount he calculated interest, as Mr. Dillehunt claimed that the $1,400.00 received from Mr. Hamburger was to be applied on the principal. But without further discussing this item it is evident that either Mr. Slingluff or Mr. Dillehunt is mistaken, and inasmuch as the plaintiff must sustain her claim, and especially as she and her husband executed the mortgage for $30,495, it would require more satisfactory evidence than we have to show that there was a mistake of $1,400, made in the amount of it, and we cannot allow that item.

7. Then as to Greif rent. Mr. Slingluff claims that he received that ($1,200) early in June, 1902, and endorsed a check over to Mr. Dillehunt. The latter positively denies having received it. Here again the letters are important. On June 30th, 1902, Mr. Dillehunt wrote to Mr. Slingluff that he would advertise the property in the next issue of the Maryland Journal; on July 1st Mr. Slingluff asked for a postpone-

ment until September 1st, and on July 14th Mr. Dillehunt wrote that Mr. Felgner directed him to say that he would wait until September 1st "for the interest on the Upton mortgage," and that if the interest was not paid by that date he would proceed to sell the property at once. $911.51 had been paid on April 4th, and if Mr. Slingluff had turned over the $1,200 check in June, no interest was then due on the mortgage, which had only been running from May 1st, 1901. So it is manifest that Mr. Slingluff is mistaken about this item, as the letters conclusively show.

8. There is considerable confusion in the testimony in reference to some of the other items, but we will consider the statement of the Judge below attached to his opinion in determining whether or not he reached a correct result. He excluded all the costs connected with the second foreclosure and we think properly. There was no necessity for that proceding and under the agreement, as we have found it, it should not have been resorted to without at least consulting the Slingluffs. What we have already said will be sufficient to show that we do not think the plaintiff is precluded by the audit from objecting to those items. Nor do we think she should be charged with the expenses connected with the supposed defect in the title, by reason of the omission of the seal of the clerk from his certificate as to the two Justices of the Peace, who respectively took the acknowledgments and the affidavit to the first mortgage. She was in no wise responsible for the omission, was not consulted about the expenses and ought not to be made to pay those connected with the effort to correct this supposed defect. That applies to the fee paid counsel as well as those paid the Title Company. As Mr. Felgner only required Mr. Fitzgerald to pay four per cent. interest on the deferred payments it would be unjust to charge Mrs. Slingluff with six per cent. That was another instance of his acting without consulting her.

It is contended that inasmuch as interest notes were given, interest on these notes should be allowed from their maturity.

Without determining whether such interest could ordinarily be recovered, it cannot be allowed in this case.   In the first place Mr. Felgner proceeded throughout on the principle that by reason of the default in the payment of the interest note due May 1, 1902, the entire mortgage debt had become due, in accordance with the covenants in the mortgage, as he had the right to do; and then it is made clear by all the accounts filed in the case that there was not only no understanding between them that interest should be charged on the interest notes, but that the contrary should be inferred.   He never made such demand on the mortgagors and such interest is not claimed in the statement of mortgage claim filed in the foreclosure proceedings.   Indeed the interest notes are not even filed—at least are not in the record.   So it is clear that interest on the interest notes should not have been allowed.

9. We have now considered all of the questions raised which we thought proper to refer to; excepting the method of stating the account adopted by the Court below and some of the items included or rejected affecting the amount ascertained to be due.   The learned Judge allowed the taxes for 1901 and 1902 as charged by Mr. Felgner, but only allowed $135.46 for taxes to November 14, 1903, instead of $250.07 charged by him as paid for 1903.   He did not allow an item of $60.03, insurance paid that year.   The two items charged in the accounts filed amount to $310.10, but there is a credit of "Fitzgerald Adjustment of Taxes & Insur. $130.58," which should be deducted and which leaves a balance on those items of $179.52.   We think that sum and not $135.46 should be charged against the plaintiff—making a difference of $44.06.

We are also of opinion that Mr. Felgner should have credit for $145.36 insurance paid through Mr. Dillehunt but omitted from the account rendered to Mr. Slingluff, because it was overlooked.   An item of $46.50 charged in the account as of Jan'y 21, 1903, for advertising should also be allowed, as the evidence shows that sum was paid for advertising sale

which was withdrawn at the request of the mortgagors.

There are two items which seem to us should have been charged to the plaintiff, but as the record is not clear as to them the Court below can direct further testimony to be taken, if necessary by reason of the failure of the parties to agree, which so far as we can see ought readily to be done. They are the items of $148.30 charged in the account of Mr. Felgner under date of May 12, 1903, for "Watchman, $148.30," and that of $120 included in the item in the statement by the lower Court of amount of sale to Fitzgerald. Mr. Dillehunt said in answer to the question what the first named item was for: "Caretaker up there, but that bill must have been paid, and that bill was paid." He was then interrupted by counsel and his testimony is left in some doubt as to what he meant by that answer, or who paid the bill. Then he went on to say that Mr. Slingluff moved out in June, 1903, and did not say when the bill was paid. There was apparently no occasion for a watchman in May, 1903, or prior thereto, as the house was occupied. We are therefore left in doubt as to that item, but if a watchman was properly put there for the protection of the property, or to prevent the insurance policy from becoming invalid, it should be allowed. In reference to the $120.00 spoken of, we understand that the principal paid by Mr. Fitzgerald was $27,500.00, but the Court below and counsel for Mrs. Slingluff speak of it as $27,620.00. The account filed as "Defendant's Exhibit No. 2" shows that some interest was included in the $27,120.00 received March 10, 1905, and the two interest payments credited in that account, as well as the other one, rendered to Mr. Slingluff, were each for $540.00, which is four per cent. on $27,000 for six months—$500 having been paid on account of principal November 14, 1903. These two items therefore would seem to be proper charges against the plaintiff, but as there may be some question about them we will authorize the lower Court to take further testimony as to them, although as at present

advised we would allow both of them.

On the other hand, we are of opinion that the defendant should be charged with interest on the amount received on the life insurance policy for one year. It was not actually received until March 4, 1904, but it was due in December, 1902, on a policy which had been made payable to the Slingluff trustees and Mr. Felgner. There was no valid reason for delaying the collection of it so long, and it could with ordinary diligence have been readily arranged in two months. Interest on the $3,574.15 should therefore be added to that sum as a credit to the plaintiff.

Interest on the balance found to be due the plaintiff in accordance with this opinion should be allowed from November 17, 1905, the date of Mr. Felgner's letter enclosing the account in response to the request of Mr. Slingluff for a statement, instead of from June 1, 1906, as allowed by the lower Court. We think the method followed by the Judge correct, under the circumstances of this case—that is to say of allowing interest to November 14, 1903, the date of the sale to Mr. Fitzgerald, and making other charges and allowing credits to that time, so as to ascertain the balance. What we have already said will relieve us of further discussing that question. If Mr. Felgner proposed to charge Mrs. Slingluff with six per centum interest on the amount of the deferred purchase money until paid, he should at least have consulted her about his arrangement with the purchaser.

We have thus at great length discussed many of the points raised and have given the whole case due consideration. Inasmuch as the amount due under the conclusions we have reached and whether there will be any material change from the amount fixed by the decree below are left in doubt until the two items above left open are settled, we will remand the case without reversing or affirming the decree, for further proceedings in accordance with this opinion. We will require the administrators of the estate of Edward L. Felgner to pay two-thirds of the costs in this Court and Mrs. Sling-

luff to pay the remaining third—the costs below to be determined by the lower Court.

> *Cause remanded for further proceedings in accordance with this opinion, without reversing or affirming the decree, the administrators of the estate of Edward L. Felgner to pay two-thirds of the costs in this Court (including the transcript and printing of the record), and the remaining third of said costs to be paid by Ann M. Slingluff—the costs below to be determined by the lower Court.*