## ROSS, ET AL. *v.* LOYOLA FEDERAL SAVINGS AND LOAN ASSOCIATION

[No. 54, September Term, 1966.]

508

[REDACTED]

*Decided February 15, 1967.*

The cause was argued before HAMMOND, C. J., and MAR-
BURY, OPPENHEIMER, BARNES and McWILLIAMS, JJ.

*Robert J. Cooke* for appellants.

*Joseph Pickus,* with whom were *Schimmel & Tatelbaum* on
the brief, for appellee.

McWILLIAMS, J., delivered the opinion of the Court.

Appellant[1] (Ross) insists there has been a merger of a deed
and a mortgage. If he is right, judgments junior to the mort-
gage will become collectible. Otherwise they are well-nigh worth-
less. Professor Glenn[2] says merger "is a fearsome * * * [sub-
ject] because it invokes the fine points that attend the law of
property." The trial judge (Weant, J.), quite properly we
think, held there was no merger. The facts, with minor excep-
tions, are undisputed.

Wallace E. Norris was a builder for whom things did not
march well. In February 1961 he (and his wife) mortgaged a
house he had built in Sykesville to Paradise Building Associa-
tion, Inc. (Paradise) for $15,500. On 1 November 1962 Para-
dise merged with the appellee (Loyola). Subsequent to the
mortgage Ross obtained the judgments against Norris. On or
about 31 January 1962 Norris told Paradise he could no longer
make the payments. He surrendered his payment book and au-
thorized Paradise to collect rent from the tenant and credit it
to his account. Paradise "collected rents when * * * [it] could
get them; [and] applied those rentals against the existing open

---

1. The appellants (the singular rather than the plural will be used
herein) are Albert K. Ross, whose judgments total $8240, and
County Floor Service, Inc., the holder of a $4133 judgment

2. Garrard Glenn, 1878-1949, author of *Mortgages* See biograph-
ical note in 35 Va. L. Rev., memorial edition (1949).

mortgage that * * * [it] carried on * * * [its] books." In January 1962 (after the Ross judgments) Norris and his wife gave Paradise, at its request, a deed for the property "to prevent foreclosure." Paradise, at the time unaware of the Ross judgments, agreed that if the property was sold for more than the mortgage debt the excess would be paid or credited to Norris.[3] It was possible this might happen as the tenant had an option to buy the property for $18,000 and the mortgage debt was less than $15,000. When the tenant failed to exercise his option Paradise tried, without success, to sell the property. A deposit was accepted from one prospective purchaser, but he was injured in an accident making the completion of the transaction impossible.

In March 1962 Norris (and his wife) filed a voluntary petition in bankruptcy listing $152,678 in liabilities and assets claimed to be worth $8880. The Sykesville house was listed as an asset subject to the $15,500 mortgage. The Trustee in bankruptcy reported "there was no equity in it for the estate" because it was "subject to two mortgages and several judgments." Paradise did not file a claim in the bankrupt estate. Mr. Schimmel, the attorney for Paradise, said its officers "knew something about Mr. Norris' affairs and * * * [they] were quite certain there would be no dividend so * * * [they] didn't go to the trouble of filing a claim."

Loyola, through Mr. Schimmel, tried to negotiate a waiver of the judgments so that the property could be sold to satisfy its mortgage claim. When Ross refused, Loyola began foreclosure proceedings, the mortgage debt at that time, June 1963, being $15,308. On 25 July 1963, the trustee sold the property to Loyola for $14,000 which was the highest bid. From the order of the trial judge dismissing his exceptions to the sale Ross has appealed.

Professor Glenn has given us what is perhaps the least complicated statement of the underlying principles of merger:

"* * * merger is a technical rule at best, and so, even though two rights become united in one person, a

---

3. Norris owed Paradise other monies besides the mortgage debt of $15,500.

court of equity will keep them separated if that is required by the outstanding claim of a third party or is necessary in view of the proprietor's own situation. This is often described as a matter of intention, but in reality it is a 'rule of law,' that is, it is a principle that guides our courts of equity when the facts are clear. Perhaps Sir George Jessel put it as well as can be when he said 'If there is no reason for keeping it * * * [the mortgage] then equity will, in the absence of any declaration of his intention, destroy it; but if there is any reason for keeping it alive, such as the existence of another encumbrance, equity will not destroy it.' " 1 Glenn, *Mortgages,* § 45.2 (1943).

Mr. Tiffany, discussing what may constitute evidence of an intention to effect a merger, observed:

"So a presumption against the existence of an intention to merge on the part of the owner of the two interests has been recognized when there was a junior incumbrance on the property, since the effect of a merger in such case would be to accord priority to the junior incumbrance over the claim of such owner." 5 Tiffany, *Law of Real Property,* § 1481 (3rd ed. 1939, Supp. 1965).

In 4 American Law of Property [§ 16.144 (1954 Supp. 1962)] it is said:

"In a large number of cases in which there is no evidence of intention to keep the prior mortgage alive, other than that it would be to the interest of the mortgage creditor to do so, it is held that there is no merger. But the courts go beyond this and hold, in spite of an undisputed intent on the part of the mortgage creditor to discharge the first mortgage, that nevertheless he may use it for foreclosure purposes against junior interests. This is the almost uniform result where the mortgage creditor was ignorant of the intervening lien."

A clear indication that the decisions of courts of other jurisdictions support the statements above set forth will be found

in the cases collected in 95 A.L.R. 628 (1935) and 148 A.L.R. 816 (1943). Although this Court seems never to have had before it precisely the same question here presented what we shall now hold was foreshadowed in *Felgner's Admrs. v. Slingluff,* 109 Md. 474, 480, 71 Atl. 978 (1909) when Chief Judge Boyd, who spoke for the Court, said:

> "Even when a mortgagee acquires this equity of redemption in his own name it does not necessarily follow that the mortgage becomes merged and extinguished, but it depends upon the intention of the mortgagee, and when it is for his benefit to do so the presumption is that he intended to keep the mortgage alive."

Out of the hundreds of cases supporting the principles above set forth Ross has culled a few he insists support a more rigid and hostile approach to the position in which Loyola finds itself. In our judgment these decisions are neither apposite nor persuasive.

Ross contends that no matter which approach is applied the evidence reveals a clear intention on the part of Paradise "to wipe out the mortgage debt" and deal with the property "as it saw fit." We have already indicated that we take a contrary view. We think the evidence comfortably supports Judge Weant's finding that Paradise had no intention of effecting a merger.

There seems to be little doubt that avoidance of foreclosure costs was the reason for the deed to Paradise. Norris admitted this was so. Paradise went even further. Mr. Will, the president of Paradise, agreed with Norris that whatever rents could be collected would be credited to the mortgage debt and that if the property could be sold for more than the mortgage debt it would account to Norris for the excess. An open mortgage account in the name of Norris was maintained in the books of the Association to which rents, in fact, were credited. Moreover, until Mr. Will and Mr. Schimmel became aware of the Ross judgments, efforts were made to find a purchaser. When Norris testified, more than three years later, he professed not to remember any such agreement with Mr. Will. He under-

stood, he said, that "he would be through with it" if it was "deeded back." On cross-examination, however, he was obliged to admit that his recollection may have been more accurate in March 1962 when he listed the property in the bankruptcy schedule (B-2) as belonging to himself and his wife, *subject to the Paradise mortgage.*

By taking a deed, argues Ross, Paradise gave notice to the world that it owned the property and that the Trustee in bankruptcy "never did assume that this property belonged to" Norris. Nor, he goes on, did the Trustee "treat the conveyance as a preference which could have been set aside." We do not understand this argument. The schedules clearly informed the Trustee that the property belonged to Norris. It is clear, also, that the Trustee pursued the property to the point of determining that "there was no equity in it for the [bankrupt] estate."

Continuing his argument, Ross says the deed "was in fraud of other possible creditors" because "it was worth approximately $3000 more than the existing mortgage debt" according to "uncontroverted testimony." The only testimony we have found in the record having the slightest relevance in this connection is the reference to a tenant's option to purchase the property for $18,000. Since the option was dropped it is not evidence of value. Furthermore it seems to us that if it were indeed true that, at the time of the deed, the property was worth $18,000 Norris would have sold it himself. Also it is likely the creditors and the Trustee would have exhibited considerably more interest in an $18,000 property and perhaps there is some significance in the fact that neither Ross nor any other creditor has made any effort to set the deed aside as a fraud on creditors.

In his opinion Judge Weant touched upon the doctrine of unjust enrichment. Extended comment is hardly necessary to demonstrate that Paradise was exercising prudence and foresight in taking the deed from Norris. Had it foreclosed in January 1962 it would almost certainly have been necessary for it to buy the property at the foreclosure sale. Such a course of action would, to be sure, have clinched the worthlessness of the Ross judgments. Paradise, however, tried to avoid the necessity of advancing the expenses of foreclosure since there was little hope of collecting them from Norris. It certainly did not

intend, by so doing, to relinquish its security to Ross, whose condition was desperate in any case. To allow Ross to prevail would be to enrich him unjustly. The comment in 4 American Law of Property seems especially relevant in the circumstances:

> "Actual intent, where it exists, is an adequate basis for the result of the cases. The mortgage creditor has a legitimate interest to protect himself against the elevation of the later interest. By bringing a foreclosure action in which they were joined as parties defendant the property could have been sold free and clear of their interests and he could have bought it in that state. Acquisition of the redemption in any other way should not prejudice his position with respect to such junior interests if he did not intend it to do so and was not under a duty to do acts which would have that result. The owner of the junior interest, under such circumstances, cannot object to being kept or put back into his position in the rear because he never bargained for advancement that would come to him by destruction of the first mortgage.
>
> "More generally the decisions may be justified on grounds of unjust enrichment, a doctrine implicit in the rationale of fairness in giving effect to the mortgage creditor's intent when it appears. By the destruction of the prior mortgage, the later lien or interest is elevated to a priority for which its owner paid nothing and hence is, as to him, a pure windfall. And it is a windfall at the expense of the prior mortgagee." Id. at 341.

The order of the trial judge will be affirmed and the case will be remanded for such further proceedings as may be required to bring it to a conclusion. The appellant will pay the costs.

*Order affirmed.*
*Case remanded for further proceedings. Appellants to pay the costs.*