CREST INVESTMENT TRUST, INC. ET AL. *v.*
RICHARD U. COMSTOCK ET UX.

[No. 926, September Term, 1973.]

*Decided November 15, 1974.*

The cause was argued before POWERS, DAVIDSON and MOORE, JJ.

*Allan A. Noble,* with whom were *Joseph Patrick Clancy, Michael J. Budow* and *Clancy & Pfeifer* on the brief, for appellant Sidney Kaplan. *John Noble,* with whom were *Joseph B. Simpson, Jr.,* and *Simpson & Simpson* on the brief, for other appellants.

*Landon Gerald Dowdey,* with whom were *Dowdey & Urbina* and *William F. Abell, Jr.,* and *Heeney, McAuliffe & Rowan* on the brief, for appellees.

MOORE, J., delivered the opinion of the Court.

This appeal arises in the aftermath of a financial disaster involving a small business launched in 1964 on part of a 118 acre tract of farmland near Woodsboro, in Frederick County, Maryland. The enterprise involved the breeding of guinea pigs and other small animals for use in laboratory research.

The proceedings in equity below were upon the bill of complaint of Mr. and Mrs. Richard Comstock, appellees, to enjoin the foreclosure of the farm and improvements, to enforce a trust by a reconveyance of part of the tract, to set aside a mortgage, for damages and other relief.

After a 7-day trial, the Chancellor granted a substantial

part of the relief prayed. He held that there was an attorney-client relationship between the Comstocks and one of the appellants, Sidney Kaplan, Esq.; that because the attorney-client relationship also existed between Mr. Kaplan and the appellant, Crest Investment Trust, Inc., and certain of its subsidiaries (with the knowledge of all parties), the attorney was under a fiduciary duty to make an adequate disclosure of all factors involved in an agreement between the Comstocks and Crest dated November 30, 1967, which revised a previous agreement between the parties dated July 21, 1966; that such disclosure had not been made; and that this constituted a breach of the fiduciary relationship because the agreement was unfair to the Comstocks and preferential toward Crest and its subsidiaries.

The court enjoined the foreclosure, ordered the exercise by Crest and/or its affiliated companies of an option under the 1966 agreement to purchase 97 acres of the Comstock farm, free of mortgages or other encumbrances and granted alternative relief in the event of the non-exercise of the option.

I

*Summary of Facts and Relief Ordered*

In 1964, Mr. and Mrs. Comstock began a potentially promising venture [1] in the breeding of small animals for laboratory research under the corporate title of Copper Oaks Farms, Inc., after borrowing $65,000 from the Farmers and Mechanics National Bank of Frederick, secured by a mortgage on the 118 acres owned by them as tenants by the entirety. The proceeds of the mortgage loan were substantially consumed in constructing and equipping a building for the purpose of the business on approximately

---

1. A prospectus of The Copper Oaks Farms, Inc., dated October 1, 1965, contains a letter from the Executive Secretary of the National Academy of Sciences stating that in the United States at that time nearly a half million guinea pigs were used each year for testing, treating and experiment; and that the biomedical profession would be greatly assisted "if a commercial breeding establishment, geared to producing fine quality guinea pigs were to establish itself in this country."

three acres of the tract. Mr. Comstock at that time was a plumber with a record of modest earnings. Mrs. Comstock was a school teacher in Frederick. Before coming to Maryland in 1953, Mr. Comstock's principal occupation was that of toolmaker, instrument designer and modelmaker. He had conceived — but had not perfected — an automated feeding and waste removal system to be used in uniquely designed buildings for the purpose of producing animals for research. His income projections for the business were in the range of $400,000 per year.

Pressed by business creditors and in dire need of capital, Mr. Comstock was introduced to appellant, Crest Investment Trust, Inc. in the spring of 1966. Crest, which had been established in 1956, was essentially a commercial banking institution specializing in providing funds for small businesses. Its general counsel and chief executive officer was the appellant, Sidney Kaplan, Esq. The company rejected a loan application by Mr. Comstock in the sum of $25,000. Shortly thereafter, and at a time when foreclosure of the farm was imminent, a change in policy of Crest occurred, permitting equity participations in small business promotions "where the loan application showed good possibilities for business appreciation." After a period of negotiations with Mr. Comstock, and investigation of the potential of his business, Crest entered into a written agreement with the Comstocks on July 21, 1966. The agreement was prepared by Mr. Kaplan, who was designated in the instrument as the attorney for the parties to prepare all appropriate documents to implement its terms. It was testified by Mr. Comstock that prior to execution of the agreement he suggested that his own counsel [2] examine its contents but that Mr. Kaplan replied: "Save your money, I am your attorney" — a statement denied by Mr. Kaplan but

---

2. Mr. Comstock had been represented in legal matters by The Honorable Samuel Barrick for some time prior to August, 1967. At the time of trial the former counsel was a member of the Circuit Court for Frederick County, Maryland and had ceased private practice as of September, 1969. He was called as a witness by the Comstocks. Both Judge Barrick and Judge Robert E. Clapp, Jr. of the Circuit Court for Frederick County disqualified themselves and the case was tried by Judge H. Ralph Miller, Associate Judge of the Circuit Court for Montgomery County.

confirmed by a former member of the Crest Board, Mr. Hy Perry.

The July 1966 agreement, characterized by the Chancellor as "fair" to all concerned, contemplated the formation of a new corporation (referred to as "New Corporation") to carry on the animal breeding business. The substantive provisions may be summarized as follows:

1. Crest would pay into New Corporation $10,000 for which it would receive 9% non-voting preferred stock ("in the amount of $9,000"), plus 800 shares of common voting stock at no par value. New Corporation agreed to give the Comstocks an option for 200 shares of common voting stock, to be issued for $1.00 "*at anytime after the existing mortgage with Farmers and Mechanics Bank of Frederick*" *shall have been paid;* and upon the same conditions, the Comstocks would have an option to purchase a one acre parcel upon which their residence was located for the price of $1.00. (Emphasis added.)

2. The Comstocks agreed to deed the 115 acres to New Corporation which would assume the liability of the mortgage of approximately $65,000. The Comstocks also would transfer and assign the buildings, chattels and equipment free of any claims of their own or of their corporation (Copper Oaks Farms, Inc.).[3]

3. "*Upon satisfaction of all present corporate and mortgage debt*" New Corporation would select 18 acres out of the tract and retain that parcel. With respect to the balance of the 97 acres New Corporation would either:

   (a) Convey the 97 acres back to the Comstocks for the price of $1.00; or

   (b) retain any or all of the 97 acres and pay the

---

3. The agreement was executed by the Comstocks individually, by Mr. Kaplan as executive vice-president of Crest Investment Trust, Inc., and by Mr. Comstock as president of Copper Oaks Farms, Inc.

Comstocks at $500 per acre over a five year period. Any portion not thus purchased would be conveyed to the Comstocks for $1.00. (Emphasis added.)

4. New Corporation agreed to assume general trade debts of the Comstocks in the sum of approximately $12,000.

5. An employment agreement would be entered into between New Corporation and Mr. Comstock at an annual salary of $7200 for one year, plus 15% of the net profits of New Corporation and a directorship therein.

6. During the period that New Corporation would hold ownership of the 115 acres, it would lease to the Comstocks their residence at a monthly rental of $100. Contingent upon securing life insurance on Mr. Comstock in the sum of $50,000, it would also create a death benefit for Mrs. Comstock in the sum of $5,000.

7. Crest agreed to give Mr. Comstock a three-year option to purchase up to 3000 shares of Crest stock at $8.75 per share, payable in monthly installments over a three-year period from the date of exercise of the option. Crest also agreed to either loan or pledge its credit to secure a loan for New Corporation in the sum of $15,000.

8. At the sole option of Crest, the contract was contingent upon securing an agreement from Farmers and Mechanics Bank that "interest only" would be due on the mortgage for a period of one year and an agreement from the Frederick Gas Company that Comstocks' account be paid in installments for 12 months, the balance to be due thereafter.

9. Upon formation of New Corporation the stockholders would execute a Buy-Sell agreement.

10. Sidney Kaplan was designated as attorney "for the purpose of drawing the papers and

documents," reasonable compensation thereof to be assumed and paid by the Comstocks and Crest equally.

Mr. George Conover, a mortgage banker, realtor and insurer, who introduced the Comstocks to Crest management and testified below, had made an appraisal of the Comstocks' property in November, 1965, as follows:

| | | |
|---|---|---|
| — Three acres and buildings for breeding animals | $100,000 | |
| — Farmland | 64,200 | |
| — Equipment and furnishings | 43,000 | $207,200 |
| Less: Mortgage | | 65,000 |
| Net | | $142,200 |

Subsequently, on September 12, 1966, Mr. and Mrs. Comstock conveyed the entire property to "New Corporation" which had been organized under the name of Comstock, Inc., and the latter assumed the mortgage debt. The conveyance was drawn by Mr. Kaplan in the form of a deed absolute without reference to the provisions of the agreement including those pertaining to the option to purchase by Crest or the alternative reconveyance to Mr. and Mrs. Comstock of the 97 acres. Shares of stock in Comstock, Inc. were issued in the name of Mr. and Mrs. Comstock but were held in escrow by Mr. Kaplan, in accordance with the agreement.

In the following 12-month period, the venture did not prosper despite a substantial infusion of funds by Crest. One explanation was the inability of Mr. Comstock to put in operation his automated system for feeding and waste removal. By the late fall of 1967 Crest's total cash contributions and commitments came to $215,346 and there were still trade debts outstanding. Between February and November, 1967, the total income of Comstock, Inc. was less than $5,000 and there were no sales from July, 1966 through January 21, 1967.

Some time prior to November 30, 1967, a decision was reached that a professional veterinarian, W. H. Dieterich, with experience in the business of breeding small animals,

would be brought into the business and that the July 21, 1966 agreement would be revised. Dr. Dieterich was hired to operate the business at a salary of $20,000, a five percent stock interest, life insurance and a pension plan. Negotiations with him were handled by Mr. Comstock and Mr. Perry, a Crest director.

Thereafter, the November 30, 1967 agreement was executed. It contained recitals that the purpose of the agreement was to "modify and supplement" the July, 1966 contract; that Crest had pledged its credit and supplied necessary working capital in excess of $100,000 and had purchased the preferred and common stock for $10,000 as provided in the earlier agreement. It then provided that:

1. The Comstocks' option to purchase voting common stock was reduced from 200 shares to 100 shares, to be issued at $1.00 at any time after the Farmers and Mechanics Bank mortgage "and the debt due as hereinafter mentioned" shall have been paid. The other 100 shares of voting common stock would be issued by Comstock, Inc., to a pension plan fund conditioned upon approval by the Internal Revenue Service.

2. With respect to the 115 acres, the provisions of the earlier agreement were "revoke[d] and restate[d]" so that the land previously conveyed by appellees to Comstock, Inc. "shall remain the absolute and sole property of Comstock, Inc., or its assigns," the only exception being that upon the repayment of the mortgage debt to Farmers and Mechanics Bank *and* the repayment[4] to Crest of all monies advanced to Comstock, Inc., the residence of Mr. and Mrs. Comstock and one acre upon which it was situated would be reconveyed to them for $1.00.

3. Mr. Comstock would be employed on a full time basis at the same salary and under the same

---

**4.** As to the amount of the advances, Mr. Kaplan testified that "[W]hen we wrote this agreement we merely stated, Dick and I in our conversation, that it was over $100,000. I did not have the exact figure before me at that time."

conditions as in the prior agreement, except that his participation in net profits was reduced from 15% to 5%, and the Comstocks' residence would be leased back to them at $100 per month as previously provided; and the widow's death benefit provision was retained. "As a further good and valuable consideration," Comstock, Inc. agreed to pay the Comstocks $1000 in cash.

4. Mr. Comstock's option to purchase 3000 shares of Crest stock at $8.75 per share was reduced to 1000 shares.

5. Sidney Kaplan, Esq. was again designated as attorney to prepare the necessary papers and documents.

One of the most significant features of the revised agreement, executed on November 30, 1967, was the provision that the farmland previously conveyed to Comstock, Inc. would "remain the absolute and sole property of Comstock, Inc.," with the single exception that upon repayment of the mortgage debt to Farmers and Mechanics Bank and repayment to Crest of *all* monies advanced to Comstock, Inc., the Comstocks' dwelling, plus one acre, would be reconveyed to them for the price of $1.00. Thus, the provision of the July, 1966 agreement, whereby Comstock, Inc. was obligated, upon satisfaction of all corporate and mortgage debt, to convey the balance of 97 acres to the Comstocks for $1.00 or purchase it at $500 per acre was totally extinguished.

According to Mr. Kaplan, this absolute conveyance of the farmland and improvements was required if Crest was to contribute any additional funds. He testified that he explained to Mr. Comstock that without additional money from Crest — which would be advanced by Crest only upon the execution of the November 30th agreement — the entire operation would have to cease. He said he explained that interest only had been paid on the $65,000 mortgage over the period of 18 months, that the land was occupied by a single-purpose building and that everything would be wiped out by mortgage foreclosure. Mr. Comstock testified, in response to a question relating to independent counsel, that

Mr. Kaplan used "words to the effect that I am the only attorney you need, don't waste your money." This was denied by Mr. Kaplan.

Not specifically discussed by Mr. Kaplan with Mr. Comstock, according to Mr. Comstock, was the fact that Crest had guaranteed the $65,000 mortgage after it had been assumed by Comstock, Inc., pursuant to the July 1966 agreement. This guarantee, made not to the Comstocks but to the mortgagee bank and at its request, was evidenced in the minutes of the Board of Directors of Crest on September 21, 1966, when the following resolution was adopted:

"WHEREAS, the Directors of this Corporation at their last meeting authorized its Executive Vice-President to negotiate with and to consummate an agreement with Richard U. Comstock *and to guarantee the first mortgage indebtedness of Richard U. Comstock,* be it

"RESOLVED, That Crest *endorse the first mortgage* on the farm property of Richard U. Comstock and Myra Johnson Comstock, his wife, to the Farmers Mechanics National Bank of Frederick *in an amount not to exceed sixty-five thousand dollars ($65,000.00)* which said mortgage covers a first lien on approximately 118 acres of land and the improvements thereon located in Woodsboro, Maryland and that the President and/or Secretary of this Corporation be and they are hereby authorized to execute on behalf of this Corporation *said guarantee agreement."* (Emphasis added.)

Subsequent to the execution of the 1967 agreement, the sum of approximately $82,000 in cash was advanced to Comstock, Inc. by Crest, bringing the total cash invested by Crest as of July 31, 1968 to the sum of $197,520, together with guaranteed notes in the sum of $3,000.

Notwithstanding these cash outlays, the business continued to founder. After Dr. Dieterich's arrival, a decision was made to discontinue the effort at automation until the company generated sufficient income

conventionally to meet expenses. Mr. Comstock remained as a director and was in charge of the design and mechanical operation of the plant.

Comstock, Inc. ceased doing business, however, in late 1968. Some time before its demise, in mid-1968, the Comstock land was conveyed to Crest. The purpose, according to Mr. Kaplan, was to make Crest's financial statement "acceptable to its lending sources" and to improve that of Comstock, Inc. Thereafter, the officers of Crest caused the formation of another corporate organization known as Animal Resources, Inc. (A.R.I.) for the purpose of generating additional capital. The new organization issued debentures in the sum of $15,000 each and, upon the basis of Crest's guarantee, 20 such debentures were sold providing additional cash in the sum of $300,000. All the real property and equipment of Comstock, Inc. was sold to A.R.I. and on June 18, 1969, Crest took a $45,000 mortgage as partial security for monies advanced by it.[5] The Comstocks received no stock interest in A.R.I. and the previous reservation to them of their residence and one acre for one dollar did not survive. The entire capital stock of A.R.I. was "spun-off" to the Crest stockholders on the basis of three shares of A.R.I. for one share of Crest.

For reasons not fully understandable from the record, even the additional $300,000 from debenture sales was insufficient to sustain the enterprise and on January 10, 1970, Mr. Kaplan, Dr. Dieterich and I. B. Kemick, another director of Crest, and their wives, individually borrowed $45,000 from the Maryland National Bank. The proceeds were loaned to A.R.I. which executed a $45,000 note to these individuals secured by another mortgage on the property. This note was endorsed with full recourse to Maryland National Bank as security for the loan. Maryland National required that the earlier mortgage to Crest also in the sum of $45,000 be subordinated.[6] Even this new loan, however, was not enough to keep A.R.I. from closing down.

---

5. Mr. Kaplan testified that Comstock, Inc. owed Crest more than $250,000 at the time of the sale of land and chattels to A.R.I. but that Crest could not realistically take a mortgage for more than $45,000 because the value of the encumbered real property and equipment would not justify it.

6. Maryland National Bank, although named a party defendant did not

It was testified by Mr. Kaplan that the total loss to Crest on this venture before Animal Resources, Inc. ceased doing business in 1970 was $730,000, including debenture money, two-thirds of which was paid off by Crest.

In the fall of 1968, before the formation of Animal Resources, Inc., Mr. Comstock sought legal assistance from attorney Glenn Carlisle Michel of Frederick "because he was having problems with regard to his working relationship with Crest." On June 12, 1969, Mr. Michel wrote a letter to Crest stating in part:

> ". . . I find the central problem being one of the status of the title to the farm . . . as well as the nature of any working agreement with both Crest and Animal Resources, Inc."

In August, 1969, after the exchange of correspondence between Mr. Michel and Crest, Mr. Comstock was discharged from his position with A.R.I. and subsequently Mr. Michel withdrew as his counsel because of a long standing relationship between his firm and the Farmers and Mechanics National Bank. Mr. Michel properly informed Mr. Comstock that, because of the possibility of foreclosure proceedings and a resulting conflict, he could no longer represent him. Other counsel was subsequently engaged by the Comstocks and the Bill of Complaint in this case was filed on April 26, 1971.[7] On April 29, 1971, the Circuit Court (Shure, C. J.) issued an order enjoining Sidney Kaplan and Irving Bowers from proceeding with a foreclosure sale of the property scheduled for May 3, 1971.

At the trial on the merits the Chancellor initially disposed of the case in an oral opinion from the bench and thereafter entered a decree containing comprehensive findings of fact and conclusions of law. The decree stated in part:

> "The law of Maryland required that the

___

participate in the trial, stating it would accept and abide by the decision of the court.

7. On April 15, 1971, the Farmers and Mechanics National Bank had sent a default notice and demand for full payment of the mortgage to Mr. and Mrs. Comstock. The principal amount owing was $44,099.14 plus accrued interest to May 3, 1971 in the sum of $1,933.01.

defendant Kaplan having undertaken representation of more than one party to this transaction owed a continuing duty to each party to act fairly and to adequately disclose to each all relevant facts of each transaction and to act in his clients best interest as an attorney."

The court concluded that appellant Kaplan, with the knowledge of his client, Crest, failed to discharge adequately his duty to the Comstocks. It was then ordered:

"That the [appellants] Crest, Comstock, Inc. and Animal Resources, Inc., or any one of them shall [may] exercise the option of July 21, 1966 by paying the mortgage in the amount of sixty-five thousand dollars ($65,000) to Farmers and Mechanics National Bank and by the tender of the sum of forty-eight thousand five hundred dollars ($48,500) to the plaintiffs." [The latter being the option price of the 97 acres at $500 per acre.] [8]

The option was required to be exercised within 60 days;

"That should the [appellants] fail to exercise their option or fail to pay the specified mortgage and make the required tender within the sixth [sic] (60) days allowed the ninety-seven (97) acres in litigation will be reconveyed to the plaintiffs free and clear of all mortgages and encumbrances including the mortgage to Farmers and Mechanics National Bank." [9] [The directory provisions of this part of the decree were addressed to the corporate appellants, Crest and A.R.I. and appellant Kaplan];

That the attempted foreclosure of the property be permanently enjoined;

That should the option be exercised and the

8. According to Mr. Comstock the value of the land was $125,000 to $130,000 in 1966 and the value at the time of trial in June, 1973 was $300,000. Mr. George Conover, the mortgage banker who testified for appellants, valued the land at $64,200 in late 1965.

9. We are told that as of November 1, 1973 there were recorded judgments and liens on the farm property aggregating $51,683.34.

parties be unable to agree "on the one acre to accompany the residence house" or should the appellants fail to exercise the option, then the entire property be partitioned "for the purpose of accomplishing either the conveyance of the one acre and residence or the reconveyance of the ninety-seven (97) acres, whichever is appropriate."

Appellants did not exercise the option. At the time of trial the Comstocks were still occupying the farm but no business was being conducted.

## II

*Appellants' Contentions*

The appellants contend that the Chancellor erred:

1. In finding an attorney-client relationship between the Comstocks and appellant Kaplan.
2. In finding that appellant Kaplan had acted unfairly and failed to make an adequate disclosure.
3. In ruling that the guarantee by Crest of the first mortgage indebtedness extended to the entire principal amount rather than any deficiency resulting from foreclosure.
4. In finding that the appellants' claim was not barred by laches.
5. In ordering that the option price be paid in full rather than over a five-year period as originally provided.
6. Because the relief granted in the final decree would result in unjust enrichment of the appellees.

## III

*The Attorney-Client Rulings*

The issues which confront us with respect to the assignment of alleged error by the Chancellor in finding an

attorney-client relationship between the Comstocks and Mr. Kaplan are (a) whether the court's determination that the relationship existed was clearly erroneous and (b) if not, whether the holdings were clearly erroneous that the November 30, 1967 agreement was unfair and that appellant Kaplan failed to make an adequate disclosure. Maryland Rule 1086.

On the first issue, the findings stated in the decree of the court were these:

> "Defendant Sidney Kaplan, a director and officer of the defendant Crest, acted as attorney for Richard and Myra Comstock beginning in 1966, a short time prior to their signing of the July 21, 1966, agreement just described, and continued to act as their attorney until 1969 when another attorney attempted to settle the difference that had arisen between plaintiffs and defendants. Throughout this time defendant Kaplan also represented defendant Crest Investment Trust, Inc., and from the time of their formation on, two wholly owned subsidiaries of Crest, defendant Comstock, Inc., and Animal Resources, Inc. There was no real controversy and no divergence of interest as between Crest and its subsidiaries, Comstock, Inc., and Animal Resources, Inc. However, in representing these several corporations in their dealings with plaintiffs, defendant Kaplan undertook a dual representation of conflicting interests."

Later in the decree, the court addressed itself to appellants' contention that there existed only a business relationship:

> "The defendants contend that the plaintiff, Richard U. Comstock, and the defendants were engaged in a straight business transaction and that there was in fact no fiduciary relationship. Although Mr. Comstock had had previous business experience he was not trained as an attorney in

corporate and conveyancing matters and when he indicated that he would consult his own attorney he was told by the defendant Kaplan 'Save your money, I'm your lawyer'. On other occasions he was dissuaded from seeking independent legal advice and was always assured that the defendant Kaplan was acting as his attorney and on his behalf. *The court finds that not only was there an attorney client relationship between the plaintiffs and the defendant Kaplan but that the plaintiffs depended on Mr. Kaplan for his advice and looked to his knowledge in corporate transactions of the type the parties entered into and that they did not become fully aware of what was going on until late in 1969.*" (Emphasis added.)

In the court's earlier oral opinion from the bench, corroboration of the making of the above statement by Mr. Kaplan, but denied by him, was found in the testimony of Mr. Hy Perry, a former officer and director of Crest and A.R.I., who was present when the Comstocks signed their initial agreement with Crest on July 21, 1966. Mr. Perry testified:

"THE WITNESS: Mr. Comstock, in an embarrassed way, suggested that he would show this to an attorney and Mr. Kaplan told him, 'Save your money, I am your attorney.' "

That was not the only occasion, as Mr. Perry went on to state:

"THE WITNESS: There was another understanding, another agreement was drawn up by Mr. Kaplan and presented to Mr. Comstock to sign that would in essence give Crest the control of the entire property and at that time Mr. Comstock, again, voiced the desire or suggestion that his attorney check this and Mr. Kaplan was annoyed and told him he was his attorney, that that wasn't necessary."

Judge Barrick who had represented the Comstocks "on most matters" until August, 1967, testified that he had not been consulted by appellees with reference to the Crest transactions and had never been shown any of the Crest-Comstock agreements. No other independent counsel was consulted by Mr. Comstock until he engaged Mr. Michel in the fall of 1968. In a pretrial deposition, portions of which were read into evidence by appellees at the trial, Mr. Kaplan was asked: "You never suggested that he get independent counsel?" His answer was: "To the best of my recollection, no, sir."

Conceding that the contractual relationship of attorney and client may be implied, *Ewing v. Haas*, 132 Va. 215, 111 S. E. 255, 258 (1922) and, of course, that whether the relationship exists depends on the facts and circumstances of each case, *Bailey, Oot and Ryan v. Butcher, Tanner and Foster*, 240 N. Y. 323, 148 N. E. 537, 538 (1925), it is variously contended by appellants that the unilateral act of one party (presumably appellant Kaplan) is not sufficient to create the relationship, that the "only probative evidence . . . deals with what Mr. Kaplan said and did" and this is "in dispute," that the court viewed only isolated pieces of evidence and that, to the extent that Mr. Kaplan acted as attorney for the appellees he did so not only for them but for the corporate appellants as well, for the limited purposes set forth in the two agreements and that he never received any compensation from the Comstocks over the 4-year period.

As for compensation, the Court of Appeals has held that the relationship of attorney and client is not necessarily dependent on the payment of a fee. In *Central Cab Co. v. Clarke*, 259 Md. 542, 270 A. 2d 662 (1970), Barnes, J., speaking for the Court, stated:

> "Although an agreement upon the amount of a retainer and its payment is rather conclusive evidence of the establishment of the attorney-client relationship, the absence of such an agreement or payment does not indicate conclusively that no such relationship exists. *Indeed, the payment of fees is*

*not a necessary element in the relationship of attorney and client. The services of an attorney to the client may be rendered gratuitously but the relationship of attorney and client nonetheless exists."* (Citations omitted.) (Emphasis added.)

Authority in other States also supports the rule that the relationship between attorney and client may be implied from the conduct of the parties and does not depend, unless the parties so specify, on the payment of a fee or the execution of a formal contract. *E. F. Hutton & Co. v. Brown,* 305 F. Supp. 371 (S.D. Texas 1969); *Lawrence v. Tschirgi,* 244 Iowa 386, 57 N.W.2d 46 (1953); *Bresette v. Knapp,* 121 Vt. 376, 159 A. 2d 329 (1960). Thus, an attorney-client relationship was held to exist between a party and his cousin who was a practicing attorney and who did not collect a fee or have any contract of employment. *Prigmore v. Hardware Mut. Ins. Co. of Minnesota,* Tex.Civ.App., 225 S.W.2d 897 (1949). It is sufficient for such a relationship that the advice or the assistance of an attorney is sought and is received. *Nicholson v. Shockey,* 192 Va. 270, 64 S.E.2d 813 (1951). The trial court had before it testimony concerning Mr. Comstock's desire for independent counsel more than once and Mr. Kaplan's assurances that none was necessary and that he would be Mr. Comstock's attorney. It was the trial court's responsibility to weigh the testimony and to judge the credibility of the witnesses. This is not our function, *West v. State,* 3 Md. App. 123, 127, 238 A. 2d 292 (1968); and the judgment of the lower court will not be set aside on the evidence unless clearly erroneous. Maryland Rule 1086; *McFadden v. State,* 2 Md. App. 725, 237 A. 2d 93 (1968). We cannot say the judgment of the lower court that an attorney-client relationship existed between Mr. Kaplan and Mr. Comstock was clearly erroneous.

We turn, therefore, to the further issue, whether the court was clearly erroneous in its findings that the November, 1967 agreement was unfair and that appellant Kaplan failed to make an adequate disclosure. The findings of the Chancellor as set forth in the decree were as follows with

respect to the nature and fairness of the initial agreement of July, 1966:

> *"The court further finds that defendant Kaplan made an adequate disclosure to plaintiffs of all relevant factors involved in their entering into the agreement of July 21, 1966, with defendant Crest, for which he was also acting as attorney, and said agreement was fair to all parties . . . It was the clear intention of the parties that the existing mortgage placed on the property to fund the business operation was to be paid from future profits of the business or upon default by the defendant Crest. It is also clear from their original contract and from the evidence that the ninety-seven acres of ground was to be free from the encumbrance of that mortgage although the mortgage was not released at that time.* It was not the intention of the parties to include the ninety-seven (97) acres of property in the original contract of July 21, 1966, but rather to free it of all business debts. The intention is further demonstrated by the option the plaintiffs granted to the defendant Crest to purchase the remaining ninety-seven (97) acres at five hundred dollars ($500.00) per acre (thought to be the fair market value in 1966) without any reduction in price by proportioning the mortgage over the entire tract." (Emphasis added.)

On the other hand, the court characterized as "obviously preferential" to Crest and Comstock, Inc. and "manifestly unfair" to Richard and Myra Comstock, the provisions of the November, 1967 revision of the July, 1966 agreement:

> "On November 30, 1967, at a time when defendant Kaplan was still acting as attorney for the plaintiffs in their dealings with defendant Crest and its subsidiary, defendant Comstock, Inc., plaintiffs entered into a written agreement with defendant Crest (Plaintiffs' Exhibit 6(A)) which

attempted to modify their prior agreement of July 21, 1966, in such way as to convert the option granted thereunder to purchase ninety-seven (97) acres of the Comstock farm for a stated price into an absolute transfer of such acreage, without payment, to Comstock, Inc. In the same writing plaintiffs agreed also to reduce their potential participation in the profits of Comstock, Inc., and Crest, extinquishing half of their stock options in the former and two-thirds of the latter. *The plaintiff, in brief, contributed ninety-seven (97) acres of land as additional capital to the faltering business, Comstock, Inc., a subsidiary of defendant Crest, on the advice of their counsel, the defendant Kaplan and did not receive a more substantial interest in the business but less.* Would any attorney acting fairly advise a client to make such an investment? The only justification is that other investors had already lost large sums of money and that Comstock had an interest in seeing the business succeed." (Emphasis added.)

Finding disclosure by appellant Kaplan inadequate under the circumstances, the decree stated:

"It is patently clear that the defendant Kaplan, acting as attorney for the plaintiffs in this transaction, failed to make an adequate disclosure to them of all relevant factors involved in their entering into the agreement of November 30, 1967, with defendant Crest for which he was also acting as attorney, and said agreement was obviously preferential to his clients, defendants Crest and Comstock, Inc., and manifestly unfair to his clients, the plaintiffs. *Defendant Kaplan failed to disclose to plaintiffs that Crest, having guaranteed the mortgage on their farm, might have to pay that mortgage, and that their home and the ninety-seven (97) acres of their farm optioned to Crest's subsidiary might not be obligated for the*

*debts of Comstock, Inc.* There was no disclosure measuring the value of the acres against the value of what Crest had invested or explaining how the Comstocks would receive a decreased rather than an increased interest in potential profits for having contributed their farm to the Crest subsidiary. Furthermore, the later conveyance to Crest is nowhere explained by the evidence, although made at a time when defendant Kaplan was acting as attorney for the Comstocks. *Any lawyer should have known that this was not a fair transaction and the failure to protect the plaintiffs and so advise them while acting as their attorney is a complete breach of the fiduciary relationship. The court views defendant Kaplan's actions as an obvious attempt to protect his client Crest from further losses occasioned by the poor investment he had recommended to its Board of Directors by taking advantage of the plaintiffs.*

"The court further finds that defendants Crest and Comstock, Inc., through the active participation of their officers and directors in the procurement and execution of the agreement of November 30, 1967, had knowledge of the attorney-client relationship existing between defendant Kaplan and plaintiffs, his failure to make an adequate disclosure to them, and the preferential treatment Crest was receiving at the expense of the Comstocks." (Emphasis added.)

We are not confronted here with a disputed transaction between the attorney and the client, as to which the rule is well established that such a transaction is *prima facie* fraudulent and invalid. *Baker v. Otto,* 180 Md. 53, 22 A. 2d 924 (1941). This is rather a situation where an attorney has chosen to act for both sides (with the knowledge of both sides) in a business transaction — an undertaking which is indeed fraught with serious problems and potentially dire consequences and should generally be avoided.

In the first place, counsel incurs a substantial risk of violation of Canon 5 of the Code of Professional Responsibility and the Disciplinary Rule based on this Canon, DR 5-105.[10] The Canon declares that "A Lawyer Should Exercise Independent Professional Judgment on Behalf of a Client," and DR 5-105 states that in situations where the exercise of a lawyer's independent professional judgment on behalf of a client is likely to be adversely affected by his representation of another client, the lawyer may represent both clients only "if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each." [11]

---

10. The Code is contained in Appendix F, Code 1957 (1971 Repl. Vol.) "Maryland Rules" Vol. 9B and consists of three separate but inter-related parts: Canons, Ethical Considerations and Disciplinary Rules. As stated in the preamble, the Canons are statements of axiomatic norms, the Ethical Considerations are "aspirational" and represent objectives toward which the profession should strive. The Disciplinary Rules are mandatory in character and state the "minimum level of conduct below which no lawyer can fall without being subject to disciplinary action." The Code was adopted by Maryland Rule 1230, added October 13, 1970. As noted *infra*, former Canon 6, in effect in 1966 and 1967, governed conflicts of interest.

11. The Ethical Considerations which accompany Canon 5 under the caption "Interests of Multiple Clients," EC 5-14 to 5-20 inclusive, contain the following relevant guidelines:

"Maintaining the independence of professional judgment required of a lawyer precludes his acceptance or continuation of employment that will adversely affect his judgment on behalf of or dilute his loyalty to a client. This problem arises whenever a lawyer is asked to represent two or more clients who may have differing interests, whether such interests be conflicting, inconsistent, diverse, or otherwise discordant." (EC 5-14)

Again:
"If a lawyer is requested to undertake or to continue representation of multiple clients having potentially differing interests, he must weigh carefully the possibility that his judgment may be impaired or his loyalty divided if he accepts or continues the employment. He should resolve all doubts against the propriety of the representation." (EC 5-15)

And also:
"In those instances in which a lawyer is justified in representing two or more clients having differing interests, it is nevertheless essential that each client be given the opportunity to evaluate his need for representation free of any potential conflict and to obtain other counsel if he so desires. Thus before a lawyer may

In addition, when an attorney undertakes dual representation without making the full disclosure required of him, he incurs the risk of civil liability to the client who suffers loss caused by such lack of disclosure. *Lysick v. Walcom*, 258 Cal. App. 2d 136, 65 Cal. Rptr. 406 (1968).[12]

As the Supreme Court of New Jersey stated in the case of *In re Kamp*, 40 N. J. 588, 194 A. 2d 236 (1963), "A conflict of interest is inherent in the relationship of buyer and seller; and [former] Canon 6 is applicable to every occasion in which an attorney undertakes to represent both the buyer and the seller under a sales contract."

'Former Canon 6, which was in effect during the time of the transactions in this case, provided in part:

"It is unprofessional to represent conflicting interests, except by express consent of all concerned given after a full disclosure of the facts. Within the meaning of this canon, a lawyer represents conflicting interests when, in behalf of one client, it is his duty to contend for that which duty to another client requires him to oppose."

The instant case, to be sure, presents a situation substantially different from a single transaction for the sale of realty such as was involved in the case cited. Here, the conveyance of the land and improvements was a *part* of a business promotion and all parties were ultimately interested in the success of the enterprise. Even in such

---

represent multiple clients, he should explain fully to each client the implications of the common representation and should accept or continue employment only if the clients consent." (EC 5-16)

Finally:

"Occasionally a lawyer for an entity is requested by a stockholder, director, officer, employee, representative, or other person connected with the entity to represent him in an individual capacity; in such case the lawyer may serve the individual only if the lawyer is convinced that differing interests are not present." (EC 5-18)

12. *See,* Annotation: "What Constitutes Representation of Conflicting Interests Subjecting Attorney to Disciplinary Action," 17 A.L.R.3d 835-854; *and see,* Annotation: "Malpractice: Liability of Attorney Representing Conflicting Interests." 28 A.L.R.3d 389-399.

situations, however, the "clients" involved can foreseeably have adverse economic interests and if duality of representation is undertaken, it should be "within very narrow limits." *Texarkana College Bowl, Inc. v. Phillips,* 408 S.W.2d 537 (Civ. App. Texas, 1966). *Cf. Busey v. Perkins,* 168 Md. 19, 176 A. 474 (1935); *Rippon v. Mercantile Safe Dep.,* 213 Md. 215, 131 A. 2d 695 (1957).

Furthermore, if dual representation does occur, fidelity to the Code of Professional Responsibility and prudent concern for legitimate self-interest against possible liability dictate that full disclosure be made of the possible dangers involved and that the legal representation be fundamentally fair to both sides. The requirements of full disclosure were spelled out in *In re Kamp, supra* (194 A. 2d p. 240) in terms not inappropriate to the instant case:

> "Full disclosure requires the attorney not only to inform the prospective client of the attorney's relationship to the seller, *but also to explain in detail the pitfalls that may arise in the course of the transaction which would make it desirable that the buyer have independent counsel. The full significance of the representation of conflicting interests should be disclosed to the client so that he may make an intelligent decision before giving his consent.* If the attorney cannot properly represent the buyer in all aspects of the transaction because of his relationship to the seller, full disclosure requires that he inform the buyer of the limited scope of his intended representation of the buyer's interests and point out the advantages of the buyer's retaining independent counsel." (Emphasis added.)

In this case it is claimed by appellant Kaplan and the corporate appellants that there was no fundamental unfairness present, that all reasonable disclosure was made and that the Chancellor erred in certain of the critical findings of fact as to what should have been disclosed to the Comstocks, including particularly his conclusion that Crest

had guaranteed the entire mortgage debt, and thus afforded the Comstocks' insulation against the inevitability of loss by foreclosure.

That the new agreement was grossly disadvantageous to Mr. and Mrs. Comstock is immediately clear from a brief summary of what occurred: Under the July, 1966 contract they contemplated the ultimate relinquishment of 18 acres out of the entire tract "upon satisfaction of all present corporate and mortgage debt" but as for the balance of the farm, consisting of some 97 acres, they had under the same condition the expectancy of a reconveyance for a consideration of $1.00 or the purchase of the land by Comstock, Inc., or its assigns, for $500 per acre or $48,500. The November, 1967 agreement terminated all interests on their part in the entire tract and its improvements, reduced their stock participation in Comstock, Inc. from 20% to 10%, reduced their participation in the profits of the enterprise from 15% to 5% and reduced their option to purchase stock in Crest from 3000 to 1000 shares. Because of the evanescent nature of any profits from Comstock, Inc., and the obvious inability of the Comstocks to exercise their option to buy Crest stock at $8.75 per share (the book value of which at the time of the agreement was $5.40 per share), the stark reality is that the only thing actually salvaged consisted of Mr. Comstock's job at $7200 per year and a forlorn hope — after Crest was ultimately made whole — of reacquiring title to their home and *one* of the 115 acres.

Under such circumstances, we cannot accept the contentions of appellants that the court's findings of unfairness of the November 30, 1967 agreement were based upon "speculation and surmise." Nor do we find that the court's conclusion in this regard was "clearly erroneous." Rule 1086.

We deem it a truism, however, that persons *sui juris* may embrace contractual unfairness in the exercise of business judgment and be bound by their bargain; but in the context of this case, that result is compelled only if Sidney Kaplan made a full disclosure not only of all the facts but also of applicable principles of law.

An objective, panoramic view of the Comstocks' situation just prior to November 20, 1967 would have revealed *inter alia:*

1. That Comstock, Inc., having assumed the mortgage debt was under a duty to pay it and to protect the Comstocks against any demands that might be made against them for the debt which the mortgage secured. *Rosenthal v. Heft,* 155 Md. 410, 142 A. 598 (1928); *Wright v. Wagner,* 182 Md. 483, 34 A. 2d 441 (1943); *Brice v. Griffin,* 269 Md. 558, 307 A. 2d 660 (1973). However, this did not operate as a release of the mortgagors, Mr. and Mrs. Comstock, from the covenants under the mortgage to the Bank. The relationship between them and Comstock, Inc. was that of principal and surety but as to the mortgagee bank, the only liability under the covenants of the mortgage was upon the Comstocks. *Wright v. Wagner, supra.* The Bank had the right to proceed by either a direct action against them or by foreclosure. Of course, since Comstock, Inc. was at that time in a deficit position to the extent of $73,032.87, its assumption of the mortgage debt afforded the Comstocks no comfort, and their right of direct action against Comstock, Inc. would be unavailing.

2. That Crest, under its Resolution of guaranty, was liable to the mortgagee bank in an amount up to the principal sum of $65,000. In this respect, we must reject the contention of appellant that upon the authority of *Walton v. Washington County Hospital Association,* 178 Md. 446, 13 A. 2d 627 (1940), Crest's liability would be limited to the amount of any deficiency after foreclosure. In *Walton,* the guarantor's liability was limited by contract to the sum of $5,000; the mortgage debt itself was $20,000 and the deficiency, after foreclosure, was $7709.97. In limiting the guarantor's liability to $5,000, the court stated

the general rule for construction of guaranty contracts (178 Md. at p. 450):

"The court should give the instrument that construction which will best accord with the intention, as manifested by the language in the light of all the surrounding circumstances."

Here, the language of the Resolution adopted by Crest contained no limitation but spoke of the "first mortgage indebtedness of Richard U. Comstock" and authorized the execution of the guaranty agreement, after reciting the full principal amount of the $65,000 mortgage. "If the contract of guaranty is unconditional and does not limit in any way the obligations of the guarantor, the guarantor's liability would be equal to that of the principal debtor." 38 Am.Jur.2d, Guaranty, § 74; *Steinberg, Adm'r. v. Gonzales*, 215 Md. 100, 135 A. 2d 631 (1957). At the same time, however, Crest, upon payment of all of the mortgage debt or the amount of any deficiency would then be subrogated to the rights of the Bank including all its rights to the secured real property. 73 Am.Jur.2d Subrogation, §§ 53, 90; *Embrey v. Embrey*, 163 Md. 162, 161 A. 153 (1932); *Behlen Manufacturing Co. v. The First National Bank of Englewood*, 28 Colo. App. 300, 472 P. 2d 703 (1970).

3. The mortgagee bank therefore had the following options: (a) initiate foreclosure proceedings; (b) proceed by direct action against Crest as guarantor; (c) proceed against the Comstocks by an independent action to recover the debt; (d) enter into negotiations.

In the light of the foregoing, Mr. and Mrs. Comstock clearly required (a) a factual and financial analysis of the consequences of a mortgage foreclosure and (b) a careful exploration of available remedies by court action. With respect to a foreclosure, the necessary information would

include (1) the then market value of the land; (2) the value of the buildings and equipment and their own residence; (3) the amount of any liens against the property and (4) determination of an approximate surplus after foreclosure, to which they as the original mortgagors would be entitled; or (5) a determination of a possible deficiency for which they might be liable.

Consideration of the remedies available to Mr. and Mrs. Comstock at that time would have involved an analysis of the merits of a suit or suits in equity to enjoin foreclosure by the mortgagee bank and/or the payment of the mortgage by Crest as guarantor, seeking to defeat Crest's rights of subrogation by the assertion of equitable rights accruing to the Comstocks under the 1966 contract with Crest; or the pursuit of the remedies of recission or reformation of the 1966 agreement on the grounds, *inter alia*, that the contingency of nonpayment of the mortgage by Comstock, Inc. was never contemplated by the parties and hence not provided against.

This brief recital is sufficient to indicate that Mr. and Mrs. Comstock were entitled to more, at the hands of Mr. Kaplan, than the advice that foreclosure was inevitable and, in effect, that their capitulation to the terms of the November 30, 1967 agreement was their only alternative to financial ruin. Indeed, it is clear beyond any reasonable doubt that Mr. Kaplan at that point should have urged that the Comstocks engage independent counsel. His failure to do so and his failure to make adequate disclosure compel a declaration that the November, 1967 agreement was void. This was essentially the conclusion of the Chancellor, and we cannot find that he was clearly erroneous. Maryland Rule 1086.

## IV

*Alleged Error in Interpretation of 1966 Agreement*

The trial court, in its decree, interpreted the 1966 agreement to mean that the parties contemplated the absolute relinquishment by the Comstocks of the 18 acres which comprised the animal breeding center and

surrounding land. This is not challenged by the appellants; nor, indeed, by the appellees. It was also held, in effect, that the remaining 97 acres were still in the equitable ownership of the Comstocks, to be ultimately purchased by Comstock, Inc. or its successors and assigns for $500 per acre or reconveyed for a consideration of one dollar.

The appellants claim, as a separate ground of error, the court's further holding that the 97 acres were intended to be free of any encumbrance when it stated:

> "It was not the intention of the parties to include the ninety-seven (97) acres of property in the original contract of July 21, 1966, but rather to free it of all business debts. The intention is further demonstrated by the option the Plaintiffs granted to the Defendant Crest to purchase the remaining ninety-seven (97) acres at Five Hundred Dollars ($500.00) per acre, (thought to be the fair market value in 1966) without any reduction in price by proportioning the mortgage over the entire tract."

We find upon our review of the record that there is scant support for the Chancellor's conclusions that the parties' intention was that the acreage be purchased or reconveyed unencumbered. Nor do we find it probative with respect to the parties' intention that the purchase price of the 97 acres was fixed at the full fair market value in 1966. The facts and circumstances present a totally different question — not the intent of the parties but rather the proper resolution of their claims in the presence of an eventuality that was not anticipated in their 1966 agreement, *viz.*, the collapse of the business, rendering impossible the discharge of the mortgage by Comstock, Inc.

The proper test to be applied, in our judgment, is what a reasonable person in the position of the parties involved in the July, 1966 agreement would have considered a fair and equitable solution if the failure of the business precluded the payment of the mortgage debt. *U.S.I.F. Triangle Towers Corp. v. Rockwood Dev. Co.*, 261 Md. 379, 275 A. 2d 487 (1971); *Slice v. Carozza Properties, Inc.*, 215 Md. 357, 137 A.

2d 687 (1958). *Leonard v. Dyer*, 26 Conn. 172, 178 (1857). The function of the court in such a situation is aptly portrayed in Corbin on Contracts, Vol. 6, § 1331 (1962 ed., p. 357) where the author states:

> "Of course, it is not possible to tell what the two specific persons would have provided if they had foreseen; they might have forborne to make any contract at all. What the court in fact does is to fill a gap, and to fill it in the light of full knowledge of what has in fact occurred (hindsight) in accordance with the requirements of reason, justice and good faith."

We conclude that "reason, justice and good faith" would require here that if the option be exercised or the 97 acres be reconveyed, the land purchased or reconveyed bear its fair share of the mortgage debt, based upon an independent appraisal of the 18 acres and of the 97 acres and the improvements thereon; and also that the respective parcels of the total acreage and their improvements bear their proper proportion of any encumbrances upon the property which matured prior to November 30, 1967.

Our conclusion that the land should not, as a matter of fundamental fairness, be purchased or reconveyed unencumbered is predicated, on the one hand, upon the facts and circumstances that the original agreement of 1966 (a) averted the imminent foreclosure of the Comstocks' farmland and improvements, (b) discharged the trade debts of the Comstocks and their corporation in the sum of approximately $12,000, (c) resulted in an employment contract for Mr. Comstock and, as the record indicates, some part time employment for Mrs. Comstock, (d) made available to Mr. Comstock an extended opportunity for him to develop his automated feeding and waste removal system and (e) afforded the couple the continued occupancy of their residence and the use of the 97 acres up to the present time; and, on the other hand, that while Crest has the opportunity to retain 18 acres and the improvements thereon, it also invested sums substantially exceeding its July, 1966

commitment before the revised agreement of November, 1967 was entered into.

It is also our conclusion that the Chancellor should not have altered the terms of the July, 1966 agreement which provided that payment would be made by the appellants for the purchase of the ninety-seven (97) acres in equal installments over a 5-year period. The court ordered that upon the expiration of 60 days from the date of the decree, the land either be conveyed to the Comstocks or that appellants pay the sum of $48,500 in cash.

It is undisputed that the agreement clearly provided for payments over a 5-year period. We find only limited room for construction of that provision — and that is *not* whether the purchase price was to be paid in a lump sum but whether the total amount was to be paid in monthly or yearly installments. *See, Moore v. Modern Improvement Association,* 190 Md. 39, 57 A. 2d 316 (1948); *Kasten Construction Co., Inc. v. Rod Enterprises, Inc.,* 268 Md. 318, 301 A. 2d 12 (1973). In this connection, we consider it reasonable that the appellants be permitted, if they exercise the option, to make the payments in equal monthly installments *or* equal annual installments over a 5-year period, the first payment to be made within 60 days after the entry of a final order by the court, following proceedings on remand.

V

*The Claim of Unjust Enrichment*

The modification of the Chancellor's decree which will be required by our conclusions with respect to the aforesaid mortgage and encumbrances, dilutes to some extent appellants' contentions that the decree results in an unjust enrichment of the appellees.

We note, at all events, that while there is surface appeal to the argument that the equities here are "surely divided" and that it would be inequitable for the entire loss to fall on the appellants, nevertheless it was Crest which rejected Mr. Comstock's loan application and became instead an investor in his business. By virtue of Crest's 80% ownership interest

in the voting common stock of Comstock, Inc., Crest and its stockholders would reap most of the potential profits. Crest's continued financial support of the venture was certainly born of self-interest and not of solicitude for the Comstocks. Crest was investing its money for an anticipated rate of return substantially in excess of interest income had all or part of the $25,000 loan application been granted. That the investment decision of its management was unwise, is unfortunate. Appellants' reliance upon the case of *Ross v. Loyola Federal Savings and Loan Association*, 245 Md. 507, 226 A. 2d 553 (1967), is misplaced.

## VI

*The Claim of Laches*

In rejecting appellants' claim of laches, the Chancellor found that appellees ". . . did not become fully aware of what was going on until late in 1969." A perhaps more accurate statement, based upon the record, is that Mr. Comstock was not aware that he possessed a cause of action based upon an alleged breach of a fiduciary relationship until late 1969 or early 1970. The bill of complaint was filed on April 26, 1971. The court properly ruled that suit was commenced within a reasonable time. As the Court of Appeals stated in *Financial Credit Corp. v. Williams*, 246 Md. 575, 587, 229 A. 2d 712, 717 (1967):

> "Laches will not bar the assertion of a claim in equity unless the party fails to assert his rights within a reasonable time after their discovery."

Furthermore, we hold that it is rarely appropriate for the defense of laches to be interposed by an attorney and his clients in a suit by another client predicated upon a breach of the attorney-client relationship. *McCreary v. Joel*, 186 So. 2d 4 (Fla. 1966). In the case cited, the Supreme Court of Florida observed that the lapse of time is a factor to be considered in determining the merits of the case:

> "A chancellor should consider the long delay in bringing such a suit [predicated upon fraud, unethical conduct or over reaching] in evaluating

the equities and in determining the weight which should be given to the testimony of interested parties."

The Court then stated, as we can here also state: "We feel confident from our examination of this record that the chancellor did exactly that."

## VII

*Proceedings on Remand*

The aforegoing modifications of the Chancellor's decree are not, of course, self-executing but make necessary the remand of this cause for further proceedings. For the guidance of the trial court on remand, we point out that further hearings will be required at which the court will receive testimony, including the testimony of an expert appraiser or appraisers, essential to a determination of the proportion of the unpaid principal balance plus interest under the mortgage to the Farmers and Mechanics National Bank of Frederick, which should be allocated to the 18 acre parcel and the improvements thereon and to the 97 acre parcel and its improvements; and to receive testimony and documentary evidence for the purpose of ascertaining the number and amount, if any, of other encumbrances on the property which matured prior to November 30, 1967 and were recorded within the prescribed statutory period, and the amount thereof allocable to each parcel.

> *Decree affirmed in part and reversed in part as set forth in this opinion; cause remanded for further proceedings.*
> *Costs to be paid by appellants.*