482 A.2d 898

**ATTORNEY GRIEVANCE COMMISSION OF MARYLAND**

**v.**

**Mohammed Farook SAIT.**

**Misc. BV No. 14, Sept. Term, 1983.**

Court of Appeals of Maryland.

Oct. 24, 1984.

---

**3.** The period of limitation for conspiracy is 1 year; the indictment was filed 2/14/83.

Melvin Hirshman, Annapolis, Bar Counsel for Attorney Grievance Commission of Maryland, for petitioner.

M. Farook Sait, pro se.

Argued before MURPHY, C.J., ELDRIDGE, COLE, DAVIDSON,* RODOWSKY and COUCH, JJ., and JAMES C. MORTON, Jr., Associate Judge of the Court of Special Appeals (retired), Specially Assigned.

PER CURIAM.

This disciplinary proceeding comes before us on exceptions by Bar Counsel to the trial judge's findings that the Respondent, Mohammed Farook Sait (Sait), had not committed any of the violations of the Disciplinary Rules with which he was charged. We shall overrule Bar Counsel's exceptions for the reasons hereinafter set forth.

Charges against Sait arise out of the abduction of two children by their father which occurred on February 22, 1979, in Birmingham, Alabama. A team of private detectives participated with the father in carrying out the abduction plan. The children were taken from the home of their maternal grandmother where they were residing with their mother following her separation, prior to divorce, from the father. The mother's complaint against Sait ultimately resulted in these charges. Bar Counsel contends that there was an attorney-client relationship between Sait and the

---

\* Davidson, J., participated in the hearing and in the conference of the case in regard to its decision, but because of illness did not take part in the adoption of the opinion.

father at all relevant times and that Sait assisted in or counseled illegal activity. The Circuit Court for Prince George's County heard the charges and made the following findings of fact and conclusions of law.

"1. Azeez Khaleeli and Sheila Khaleeli, the complainant in this matter, were married in India in 1973. Mr. Khaleeli is a native of that country and Mrs. Khaleeli, a citizen of the United States, had been a student there.

"2. Two children were born of the marriage, Mahamad and Jenann. In December, 1978, the ages of the two children were four and two respectively.

"3. In December, 1978, Mrs. Khaleeli had made known to her husband her desire to terminate the marriage. This information had been communicated from Mrs. Khaleeli to Mr. Khaleeli while she was staying with her mother, Mrs. Jane Christian, in Birmingham, Alabama and Mr. Khaleeli had joined them there on a visit from India. The desire to terminate the marriage was not shared by Mr. Khaleeli. Each party wished custody of the children.

"4. In December, 1978, Mr. Khaleeli was able to persuade his wife to accompany him to Boston, Massachusetts in the hope that if Mrs. Khaleeli were away from her mother, he might be able to alter her thinking about the marriage. The two minor children also made the trip to Boston.

"5. Matters in Boston did not progress satisfactorily; and Mr. Khaleeli took his children to Toronto, Canada, advising Mrs. Khaleeli of his whereabouts.

"6. Mrs. Khaleeli and her mother, Jane Christian, went to Toronto, called the police, and confronted Mr. Khaleeli. Although the police took no specific action, Mr. Khaleeli relinquished custody of the children to his wife, who returned to Birmingham, Alabama, to the home of her mother, Jane Christian....

"7. Mrs. Khaleeli consulted counsel in Alabama, Mr. William Myers, and obtained through the Alabama Family Court an ex parte order giving her custody of the children.

There is no evidence that Mr. Khaleeli was served with a copy of the proceedings or had any other official notice of that custody order....

"8. There is no evidence that Mr. Sait had any knowledge of the Alabama Family Court's ex parte order giving Mrs. Khaleeli custody of their children.

"9. The families of Mr. Khaleeli and the respondent, Mr. Sait, were friends in India; and on an earlier occasion, Mr. Khaleeli had met the respondent at a party in Upper Marlboro, Maryland.

"10. Mr. Khaleeli knew that the respondent was an attorney and, therefore, called upon him for advice concerning his marital difficulties and his desire to obtain custody rights to his children.

"11. Respondent, Mohammed Farook Sait, had been admitted to the Bar of Maryland in 1973.

"12. When Mr. Khaleeli consulted Mr. Sait, Mr. Sait advised him that because he was not licensed to practice in Alabama, it would be necessary for Mr. Khaleeli to seek local counsel there.

"13. At the time of the initial contact of the respondent by Mr. Khaleeli and thereafter, both Mr. Sait, the respondent, and Mr. Khaleeli testified that no oral or written retainer agreement existed between them nor was any fee paid for legal services. Mr. Khaleeli did pay or reimburse Mr. Sait for all expenditures during the events hereinafter related....

"14. Respondent obtained the name of counsel in Alabama, Dean Lee Hodges.... Respondent conferred generally with Mr. Hodges on the telephone concerning Alabama law regarding divorce, residence and custody, and put Mr. Khaleeli in touch with Mr. Hodges.

"15. Mr. Khaleeli conferred with Mr. Hodges by telephone about his marital problems and the anticipated results of a custody hearing in Alabama. The advice given to Mr. Khaleeli was, and it led Mr. Khaleeli to believe, that he

had little or no chance to prevail in a custody hearing in Alabama; and his right to visit with his children would be denied, at least as far as taking them to India.

"16. Mr. Hodges and Mr. Khaleeli discussed the use of a private investigator to locate Mrs. Khaleeli and the children and to take such action as necessary to protect the rights of Mr. Khaleeli.

"17. On or about January 28, 1979, the respondent and Mr. Khaleeli took a plane to Atlanta, Georgia and had a meeting in the Atlanta airport with Dean Lee Hodges, Esquire, and Thomas Skinner, an investigator. Mr. Hodges and Mr. Skinner had taken a flight to Atlanta from Birmingham, Alabama to attend the meeting.

"18. At that meeting, two retainer agreements resulted.... Mr. Hodges was paid the sum of $500.00 and Mr. Skinner the sum of $2,500.00. Hodges and Skinner returned to Alabama and respondent and Mr. Khaleeli returned to the Washington area.

"19. Between January 28, 1979 and February 17, 1979, Mr. Skinner had located and surveyed the activities of Mrs. Khaleeli and the children and had been in communication with Mr. Hodges and Mr. Khaleeli. Mr. Hodges also testified that the respondent was also advised during this period of time, which the respondent denied.

"20. On Saturday, February 17, 1979, respondent and Mr. Khaleeli took a plane to Birmingham, Alabama. The respondent rented a motor vehicle, and the parties drove to and checked into a motel.

"21. The next day, Sunday, February 18, 1979, a meeting took place at the apartment of Thomas Skinner, at which time a plan was made to regain possession of the minor children. Attending that meeting were Mr. Skinner, a Mr. Payne, a Mr. [Mooney], a Ms. [Lowder], and Mr. Khaleeli. Mr. Hodges, counsel in Alabama, testified that respondent was at the meeting.... Respondent denied being at the meeting although he does admit attending a movie that day, February 18, 1979, with Mr. Hodges. The

Court finds that either while at the movie with Mr. Hodges or at the Skinner apartment, respondent was made aware of the general nature of what was to transpire but that he was not aware of the particulars and was not a participant in the planning. At the Inquiry Panel hearing regarding this complaint, ... respondent indicated ... that he knew there was a plan to obtain the children 'wherever they were.'

"22. Respondent left Birmingham to go to Huntsville, Alabama for several days to visit old friends. It was during respondent's stay in Huntsville when the details of the plan to take Mr. Khaleeli's children were formulated. After receiving a telephone call from Mr. Khaleeli on the evening of February 21, 1979, respondent returned to Birmingham on the morning of February 22, 1979, sometime before 8:00 a.m. Respondent and Mr. Khaleeli checked out of their motel and were picked up by Mr. Hodges in .his motor vehicle and taken to the Skinner apartment. The car which had been rented by the respondent was driven to the home of Mrs. Jane Christian by Thomas Skinner and Mr. Khaleeli was in that car. Respondent stayed in the Hodges' vehicle and that vehicle also went to the home of Mrs. Jane Christian. A third vehicle in which Thomas Payne and Ms. [Lowder] were occupants also went to the Christian home.

"23. The rental vehicle and the Payne vehicle had the license tags on the vehicles removed. The Hodges vehicle, in which respondent was a front seat passenger, had within the vehicle and in operation, a police scanner and a citizens band radio. The Hodges vehicle parked about a block away from the Christian residence and in view of the front door of the Christian home.

"24. Mr. Payne parked his car in front of the Christian residence and raised the hood. He then went to the front door of the Christian home and gained entrance on the pretext of his need to use a telephone to call about his troubled vehicle. Mr. Payne dialed a telephone number which set off a signal device held by Mr. Skinner in the second car which contained Mr. Skinner and Mr. Khaleeli.

Mr. Khaleeli and Ms. [Lowder] then went into the Christian home and obtained possession of the two minor Khaleeli children. Mr. Payne had physically lifted Mrs. Khaleeli into a room in the Christian home which also housed her eighteen year old brother, and the door was held closed with a rope while the minor children were being removed....

"25. After the children were removed, the rope was cut and all three motor vehicles left the scene.

"26. Respondent was returned to the Skinner apartment and he thereafter drove his rented vehicle to Atlanta, Georgia, and took a plane to Washington, D.C. He later called Mrs. Khaleeli from Washington, D.C. and advised her of the fact that the children had been taken by Mr. Khaleeli and were safe in his hands.

"27. Mr. Khaleeli along with Ms. [Lowder] and Mr. Skinner drove the children in a van to Florida, later taking a plane to the Bahamas and three days later Mr. Khaleeli and the children flew to Madras, India, where the children have remained since that time. Although there has been telephone communication between Mrs. Khaleeli and the children, no visitation has taken place between mother and children since February 22, 1979.

"28. Mr. Khaleeli, in March, 1979, divorced Mrs. Khaleeli in India in the customary method for the religion in which they were married. Mrs. Khaleeli obtained a divorce in Alabama in October, 1980.

"29. In the Alabama divorce proceedings, respondent filed a document as a 'friend of the Court' advising the Alabama court that while he did not represent Mr. Khaleeli, he wanted the court to know of the divorce previously granted in India....

## "CONCLUSIONS OF LAW

"Based on the above facts, the Court concludes that no attorney/client relationship existed between respondent and Mr. Khaleeli; and, therefore, respondent has not violated Disciplinary Rule 7–102 A(1)(7) or (8). While the Court is

aware that no retainer agreement or fee is necessary to establish such a relationship, *Crest Investment Trust, Inc. v. Comstock,* 23 Md.App. 280 [237 A.2d 891] (1974), the facts of this case compel the conclusion that no attorney/client relationship existed. Respondent did not dissuade Mr. Khaleeli from seeking independent legal advice nor did respondent in any way assure Mr. Khaleeli that respondent was acting as his attorney or on his behalf. *Cf. Crest Investment Trust, Inc. v. Comstock, supra.* Indeed, it is undisputed that respondent told Mr. Khaleeli that he could not provide legal advice or representation to him with regard to his marital difficulties and that Mr. Khaleeli should seek the services of an Alabama attorney, which he did. Moreover, Mr. Khaleeli did not view his relationship with respondent as that of attorney/client. *Cf. In The Matter of Lieber,* 442 A.2d 153 (D.C.1982).

"The Court further concludes that there was no violation of Disciplinary Rules 1–102(A)(4), (5) or (6). While the Court does not condone respondent's presence at the scene when the Khaleeli children were taken, the evidence indicates that respondent was merely a neutral bystander. Respondent had no advance knowledge of the details of Mr. Khaleeli's plan to take his children. Respondent did not participate, in any way, in the formulation of the plans nor in the execution thereof."

The FBI investigated this incident but there was no criminal prosecution, federal or state. We were informed at oral argument that disciplinary proceedings were brought against the Alabama attorney, resulting in his suspension from the practice of law in that state for thirty days.

 Bar Counsel excepts to the trial court's failure to find an attorney-client relationship between Sait and Mr. Khaleeli and to the failure to find violations of DR 1–102(A)(4), (5), and (6) and of DR 7–102(A)(1), (7), and (8).[1]

---

1. The cited portions of DR 1–102, "Misconduct," read:
 (A) A lawyer shall not:

At the time of the abduction Alabama Code, § 13A–6–45 (1977), which made it a criminal offense for a person to interfere with lawful custody, excepted the situation where the "actor is a relative of the child" and "[t]he actor's sole purpose is to assume lawful control of the child." The thrust of Bar Counsel's contentions is that the *manner* of carrying out the abduction involved a series of torts and perhaps crimes under Alabama law. He points to the use of a ruse to gain entry to the Christian house, the assault on Mrs. Khaleeli, the false imprisonment of Mrs. Khaleeli and of her brother, and the removal of license plates from two of the vehicles involved in the operation.

The deposition of Dean Lee Hodges, the Alabama attorney, was taken in connection with the Alabama disciplinary proceedings against him and that deposition was introduced by stipulation as evidence in these proceedings. Mr. Hodges places Sait in a meeting held on Sunday, February 17, 1979, in Thomas Skinner's apartment at which Skinner briefed the participants in the operation on his plan for effecting the abduction. While it is clear that the operation was executed precisely in accordance with that plan, there is a sharp dispute as to whether Sait had any knowledge of

---

....
(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.
(5) Engage in conduct that is prejudicial to the administration of justice.
(6) Engage in any other conduct that adversely reflects on his fitness to practice law.
DR 7–102 entitled, "Representing a Client Within the Bounds of the Law," provides in pertinent part:
(A) In his representation of a client, a lawyer shall not:
(1) File a suit, assert a position, conduct a defense, delay a trial, or take other action on behalf of his client when he knows or when it is obvious that such action would serve merely to harass or maliciously injure another.
....
(7) Counsel or assist his client in conduct that the lawyer knows to be illegal or fraudulent.
(8) Knowingly engage in other illegal conduct or conduct contrary to a Disciplinary Rule.

the manner in which Mr. Khaleeli and his hirelings would carry out the abduction. Sait denies any such knowledge. He is supported in that denial by the testimony of Mr. Khaleeli who came from India in order to testify in person in the circuit court. Sait is also supported by the deposition testimony of Thomas Skinner. Against that record we cannot say that the trial judge was clearly erroneous in his findings concerning Sait's lack of incriminating knowledge.

Further, we shall assume, *arguendo*, that the trial judge clearly erred in concluding that there was no attorney-client relationship between Sait and Mr. Khaleeli. The existence of that relationship is an element of the alleged violations of DR 7–102(A). Nevertheless, on the facts of this case, the charged subsections of that Disciplinary Rule are not violated when, as here, there is a failure to establish by clear and convincing evidence that the attorney charged either took "action ... when it is obvious that such action would serve merely to ... maliciously injure another," or, "[c]ounsel[ed] or assist[ed] his client in conduct that the lawyer [knew] to be illegal or fraudulent," or, "[k]nowingly engage[d] in other illegal conduct or conduct contrary to a Disciplinary Rule."

The exceptions of Bar Counsel are overruled and the Petition is dismissed.

IT IS SO ORDERED.

COLE, J., dissents.